R. D. MERRILL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF EULA LEE MERRILL, DECEASED, RICHARD DWIGHT MERRILL, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

R. D. MERRILL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101456, 112515, 112517. Promulgated March 7, 1945.

*Raymond G. Wright, Esq., Clarence R. Innis, Esq.*, and *Justin M. Martin, C. P. A.*, for the petitioners.

*Wilford H. Payne, Esq.*, and *C. R. Maxwell, Esq.*, for the respondent.

DISNEY, *Judge*: The case of R. D. Merrill Co. (hereinafter sometimes called Merrill Co.), Docket No. 101456, involves a deficiency

in the amount of $4,099.32 in income tax for the calendar year 1936, and a deficiency in the amount of $75.01 in personal holding company surtax for the same year. In its petition Merrill Co. claimed an overpayment in the amount of $859.17 in income tax. The respondent in his answer requests that the deficiency in income tax be increased to $12,482.11; also that the deficiency in personal holding company surtax be increased to $8,490.68, or, in the alternative, to $6,997.15.

The cases of the estate of Eula Lee Merrill (Docket No. 112515) and of R. D. Merrill (Docket No. 112517) involve deficiencies in income tax for the calendar year 1937 in the amount of $16,242.86 determined against each taxpayer. Each petitioner claims an overpayment for the year 1937 in income tax in the amount of $8,331.69.

As a result of the abandonment by the petitioners in the Eula Lee Merrill case and in the R. D. Merrill case of certain assignments of errors, the only error assigned in each is the following:

Adding to the net income of the [taxpayer] for income tax computation for the year 1937 the sum of $34,816.89 in the form of dividends received from the R. D. Merrill Company, a Washington corporation.

Effect will be given to these modifications in the decision to be entered under Rule 50 in each case.

Several issues are presented in the Merrill Co. case. The first is whether, as contended by respondent, the entire amount of distributions in cash and stock, totaling $60,202, received by Merrill Co. from T. D. & R. D. Merrill, Inc. (hereinafter sometimes referred to as T. D. Inc.) during 1936 is taxable under section 115 of the Revenue Act of 1936, or whether, on the other hand, as now contended by petitioners, only $10,654.04 is so taxable. This depends upon the amount of accumulated earnings and profits available for distribution as dividends by T. D. Inc. as of December 31, 1935, which involves the question whether operating losses in the sum of $17,187 sustained by T. D. Inc. from March 1, 1913, to December 31, 1926, as a result of the sale of property acquired by it prior to March 1, 1913, and computed on March 1, 1913, values, which exceeded the cost of such property by more than $20,000, should be charged against earnings and profits of that company for years subsequent to 1926. It also depends upon whether the accumulated earnings and profits of T. D. Inc. available for distribution in 1936 should be charged with the cost of the stock distributed by it to the taxpayer or with the value of that stock at the date of its distribution, where the cost of the stock exceeded its value on the date of distribution.

The second issue in the Merrill Co. case, raised affirmatively by the respondent, is whether the sum of $100,000, being one-third of $300,000 distributed to Merrill & Ring Canadian Properties, Inc. (hereinafter sometimes referred to as Properties, Inc.) by Merrill & Ring Lumber

Co., Ltd. (hereinafter sometimes referred to as Lumber, Ltd.) and distributed to Merrill Co. in 1936 by Properties, Inc., is subject to tax in the hands of Merrill Co. to the extent of $100,000 as an ordinary dividend. This depends upon whether a distribution to Properties Inc., by Lumber, Ltd., its parent, was a distribution in partial liquidation of Lumber, Ltd. If it was not, the further question arises whether the distribution by Properties, Inc., to Merrill Co. was a distribution in partial liquidation of Properties, Inc.

The third issue is whether the entire amount of the $100,000 cash distribution received by Merrill Co. from Merrill & Ring Lumber Co. (hereinafter sometimes referred to as M. & R. Co.) during 1936 is taxable under section 115 of the Revenue Act of 1936. This involves the question whether a deficit in accumulated earnings and profits of M. & R. Co. at the end of 1932, due to operating losses incurred as a result of the sale of property acquired by it after February 28, 1913, should be charged against subsequent earnings and profits of that company.

In Docket No. 112515 (estate of Eula Lee Merrill) and in Docket No. 112517 (R. D. Merrill) the issue presented is the same, being the extent to which the sum of $85,060 which each taxpayer received during 1937 from Merrill Co. is taxable. That depends upon how much of the $85,060 in each case constituted taxable dividends in the hands of each petitioner; and that, in turn, depends upon the amount of accumulated earnings and profits available for distribution as dividends by Merrill Co. as of December 31, 1936. The latter determination depends upon the answers reached on the issues presented in Docket No. 101456. In consideration of such issue, the following questions are presented:

(1) Whether a distribution in kind made by Merrill Co. in 1935 should be charged against the accumulated earnings and profits of the distributing company at fair market value on the date of distribution or at cost, where cost exceeded the fair market value on the date of distribution;

(2) Whether distributions in kind made by T. D. Inc. in 1937 and also by M. & R. Co. should be charged against the accumulated earnings and profits of the respective distributing company at cost; or whether the accumulated earnings and profits should first be increased by the excess of the market value over cost at the date of distribution and then charged with the market value at the date of distribution, where fair market value on the date of distribution exceeded cost;

(3) Whether the distribution in 1937 by Lumber, Ltd., to Properties, Inc., was one of a series of distributions made in partial liquidation of Lumber, Ltd., and, if not, whether the distribution in 1937 by Properties, Inc., to its stockholders was one of a series of distributions in partial liquidation.

Because of the complexity of the facts presented, clarity requires that the Merrill Co. case be first and separately considered, followed by estate of Eula Lee Merrill and R. D. Merrill.

## I.

### *Docket No. 101456—R. D. Merrill Co.*

Most of the facts are stipulated. We adopt the stipulations filed by the parties and incorporate the same herein by reference. Such parts thereof as are necessary to an understanding of the issues are set forth with our findings of fact made from evidence submitted at the hearing. Certain general facts will first be set forth and then, to set the matter forth more clearly, the particular facts applying to each issue will be stated, followed by opinion on that issue.

FINDINGS OF FACT.

(In General)

Merrill Co. is a personal holding company of the R. D. Merrill family, organized under the laws of the State of Washington on July 12, 1924. Its income tax return and its personal holding company return for 1936 were filed with the collector of internal revenue for the district of Washington at Tacoma, Washington. Throughout the entire taxable year 1936 the authorized and outstanding capital stock of Merrill Co. consisted of 10,000 shares of common stock with a par value of $100 per share and 10,000 shares of preferred stock with a par value of $96 per share. At all times the stock was owned and held by R. D. Merrill, his wife Eula Lee Merrill (prior to her death), and their children.

During 1936 Merrill Co. owned 50 percent of the outstanding capital stock of T. D. Inc.; 33⅓ percent of the outstanding capital stock of Properties, Inc.; and 33⅓ percent of the outstanding stock of M. & R. Co.

By virtue of its ownership of 50 percent of the stock of T. D. Inc., Merrill Co. received on September 18, 1936, one-half of the following distribution of stocks:

666⅔ shares—Crescent Logging Co., purchased for cash in 1927, 1928, and 1930
543 shares—Sol Duc Investment Co., purchased for cash in 1929 and 1932
20 shares—Olympic Hotel Co.
10 shares—Community Hotel Corporation

The total cost basis of the Crescent Logging and Sol Duc shares was $114,633.34. The Community Hotel and Olympic Hotel stock had a cost basis of nil. All of the stock had a fair market value of $404 at the date of distribution. Merrill Co. also received a distribution of

$60,000 in cash from T. D. Inc., $35,000 on October 20, 1936, and an additional $25,000 on December 11, 1936. T. D. Inc. had, prior to September 18, 1936, made no distributions to its stockholders by way of dividends.

By virtue of its ownership of 33⅓ percent of the stock of Properties, Inc., Merrill Co. received during 1936 a cash distribution from Properties, Inc., in the amount of $100,000; also by virtue of its ownership of 33⅓ percent of the stock of M. & R. Co., a cash distribution during 1936 from M. & R. Co. in the amount of $100,000.

Merrill Co. paid an income tax in the amount of $859.17 for the calendar year 1936 and in its return treated as taxable dividends only the $100,000 received from M. & R. Co., $10,469.25 of the $60,000 received from T. D. Inc., and $202, the fair value of the stock received from T. D. Inc.

### A. – Facts Pertaining to the 1936 Distributions of T. D. Inc.

T. D. Inc. was a corporation organized under the laws of the State of Washington in 1912. It is engaged in the business of holding and logging timber and of holding investments. Its capital stock was owned in equal shares by Merrill Co. and Dixmont Co. The latter was a personal holding company for the interests of the T. D. Merrill family in the same manner as Merrill Co. was a personal holding company for the interests of the R. D. Merrill family.

On March 1, 1913, T. D. Inc. had no earned surplus. However, as of that date, it did have unrealized surplus of $123,645.63 from the appreciation in value of timber and timber lands. During the period from March 1, 1913, to December 31, 1926, T. D. Inc. sustained net operating losses of $17,187 as a result of the sales of timber lands, based on March 1, 1913, values, which were at least $20,000 higher than cost. The books of T. D. Inc. showed a deficit of $17,187 on December 31, 1926. From January 1, 1927, to December 31, 1935, T. D. Inc. accumulated earnings and profits of $138,777.21. However, its books reflected accumulated earnings and profits of only $121,590.21 as of December 31, 1935, as a result of the operating losses in the amount of $17,187 being charged against subsequent earnings.

The net income of T. D. Inc. for 1936, after deducting 1936 income tax payable was $13,947.21.

#### OPINION.

Petitioner contends, first, that in the determination of the amount of accumulated earnings and profits of T. D. Inc. available for distribution as taxable dividends as of December 31, 1935, prior net operating losses in the amount of $17,187 incurred by it subsequent to February 28, 1913 (March 1, 1913, to December 31, 1926), must be restored out of $138,777.21 subsequent earnings and profits earned January 1,

1927, to December 31, 1935. The pertinent provisions of the Revenue Act of 1936 are set forth in the margin.[1] On brief, petitioner states that "It is recognized that the foregoing position of petitioner is in conflict with the decision of this Court in *Loren D. Sale*, 35 B. T. A. 938. Consequently, unless this Court is ready to overrule the *Sale* case, its decision should be against petitioner on this point." The petitioner has advanced no argument to persuade us to reach a different result than in the *Sale* case. Therefore, on the authority thereof, we hold that in the determination of the amount of accumulated earnings and profits of T. D. Inc., available for distribution as taxable dividends as of December 31, 1935, prior net operating losses in the amount of $17,187 should not be charged against subsequent earnings. It is therefore held, in accordance with paragraph 9 of the stipulation of facts filed in Docket No. 101456, that the accumulated earnings and profits of T. D. Inc. as of December 31, 1935, available for dividends, were $138,777.21.

Petitioner next contends that in determining the amount of accumulated earnings and profits available for distribution when in 1936 T. D. Inc. distributed a cash dividend of $60,000 to petitioner, the accumulated earnings and profits of that company should be charged with and reduced by $114,633.34, the *cost* of certain shares of stock of. other corporations which T. D. Inc. had acquired subsequent to March 1, 1913, and had already, earlier in 1936, distributed in kind to its stockholders; whereas the respondent contends that accumulated earnings and profits should be charged only with the *fair market value* of the distributed stock, i. e., $404. Under section 115 (j) of the Revenue Act of 1936, the distributee of a dividend in kind must include it in his income at fair market value. The Merrill Co. contends, however, that the distribution in money from T. D. Inc. was in part not a dividend, but from capital, because of the view that cost of the distributed stock must be charged against earnings and profits, so that when the $60,000 was later distributed in cash, T. D. Inc. had left in earnings and profits only $10,654.04, so that only that

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113.

part of the $60,000 is taxable as dividend under section 115 (d) of the Revenue Act of 1936, the remainder being distribution of capital.

Though on this issue the petitioner relies primarily upon *Estate of H. H. Timken*, 47 B. T. A. 494; affd., 141 Fed. (2d) 625, and *National Carbon Co.*, 2 T. C. 57, and the respondent primarily upon *General Securities Co.* v. *Commissioner*, 123 Fed. (2d) 192, affirming 42 B. T. A. 754, in our opinion, the question here presented is one of first impression, and the cited cases are of little assistance. In both the *Timken* and *National Carbon* cases stock with fair market value in excess of cost was distributed; here the fair market value was less than cost. Both cases, for the statement upon which petitioner here relies, that is, in substance, that mere appreciation in value of property distributed by a corporation does not constitute corporate earnings, rely upon *General Utilities & Operating Co.* v. *Helvering*, 296 U. S. 200. In fact, in that case the question was whether the corporation had first declared a dividend and then paid it in stock costing less than the amount of declared dividend, thus profiting, under the doctrine of *United States* v. *Kirby Lumber Co.*, 284 U. S. 1. The only approach to the present question is in the statement that the petitioner "derived no taxable gain from the distribution among its stockholders of the Islands Edison shares as a dividend. This was no sale; assets were not used to discharge indebtedness." The Commissioner had conceded, and the Board found, that "where the dividend resolution imposes only the obligation to distribute in kind and it is discharged in that way, no gain or loss results to the corporation." Thus it seems clear that the only question actually at issue was whether there had been, previous to distribution, a declaration of a cash dividend. The Board relied upon *First Savings Bank of Ogden* v. *Burnet*, 53 Fed. (2d) 919, holding that there was no loss to a corporation in the distribution in kind of stock costing more than its fair market value at date of distribution, no cash dividend having been declared. The Circuit Court, in the *General Utilities* case, in agreeing in that respect with the Board, limited the conclusion, stating, in the syllabus:

Dividend declared by corporate taxpayer, payable by distribution of stock of another company, held not to show realization of taxable income *as regards contention that dividend declared was in effect cash dividend and that taxpayer realized taxable income* equal to difference between amount of dividend declared and cost of stock distributed. [Italics supplied.]

In the *Timken* case the distributed stock had been paid in by the distributee to the corporation as capital upon formation of the corporation. We held it to be capital when distributed (though we did, as above stated, relying upon the *General Utilities* case, state that the corporation "had no taxable income from the increase in the value of the shares.") The *National Carbon* case involved the question

whether a domestic corporation should, under section 131 (f) of the Revenue Act of 1934, have credit for taxes paid by its foreign subsidiary, which had distributed in kind to the petitioner. It was held that, since fair market value of the distribution was less than accumulated earnings and profits (aside from and without resorting to appreciation in value of the property distributed), the distribution was "out of" such accumulated earnings or profits, within the statutory definition furnished by section 115 (b), and therefore that the petitioner was deemed, under section 131 (f), to have paid a proper proportion of the foreign income taxes paid by the foreign subsidiary with respect to such earnings. Though the statement is also made that the earnings were consequently diminished to the extent of the fair market value of the distribution, it is apparent that it was not made in the light of the particular question here presented.[2]

The respondent relies primarily upon *General Securities Co.* v. *Commissioner*, *supra*. The case is not helpful here, involving, as it did, computation of dividends paid credit to a personal holding company under section 351 (b) (2) (C) of the Revenue Act of 1934. We considered that it was the intent of that statute to allow the dividends paid credit only in so far as the distribution was *taxable* to the recipient. Since such taxability is only to the extent of value distributed, it is apparent that the decision does not aid here.

From the above, it appears that there is, save in the *First Savings Bank of Ogden* case, little of decision that mere appreciation or depreciation of property distributed in kind by a corporation affects profit or loss to it; and that question is by no means the same as here involved, where the inquiry is as to effect of a dividend in kind upon the taxability of later distributions.

Though finding, therefore, no assistance in the cases cited, we are of the opinion that, where nonwasting corporate property is distributed in kind after it has declined to a value below cost, the cost should be charged against earnings and profits in the determination of the amount of earnings and profits available for later dividend distribution. When property, as such, is distributed, it is no longer a part of the assets of the corporation, and the investment therein goes with it. That investment is the cost. An investment of corporate assets in property is not a mere book entry, as is indeed proven when it is distributed in kind. The investment is a *res* converted from money into property, remaining in that form earnings and profits, and, when distributed, is no longer either earnings or profits or owned by the corporation. When the *res* distributed leaves the corporation, that

---

[2] Though the respondent does not, on the particular point here discussed, rely on *Binzel* v. *Commissioner,* 75 Fed. (2d) 989 (to the effect that appreciation in value of securities distributed in kind augments earnings and profits), we note that in the *National Carbon* case the *Binzel* case was cited, and we differed with the view there expressed.

investment, i. e., that amount of corporate assets, also leaves, actually and physically; and nothing less than a charge of cost, i. e., the money originally converted to property, will represent the true financial situation. Though the distributee is taxed upon fair market value, that is because of section 115 (j); and it is worthy of note that no statute sets a like rule for the corporation as to any profit to it when it distributes. Our conclusion is based upon mere realism: To charge earnings and profits with fair market value instead of a greater cost would create a book situation altogether contrary to the facts. Thus, if *all* earnings and profits were invested in property, and it was distributed in kind, after depreciation in value, a charge to earnings and profits of only the fair market value would appear to leave in earnings and profits the difference between cost and fair market value at date of distribution, when in fact nothing was left of earnings and profits, all having been invested in something no longer owned by the corporation. In the same way, even if all earnings and profits had not gone into the investment which, through distribution in kind, had disappeared or (if there had been later earnings), the charge of fair market value instead of greater cost, against any other earnings and profits, creates a situation equally at variance with fact, for no matter what the amount of accumulated earnings and profits, a charge against it of less than cost would cause it to appear, deceptively, that there is left therein an amount greater than is actually left. A corporation can make no distribution of dividends without something to distribute, and any distribution of more than the residue left in earnings and profits must, necessarily and mathematically, be from either capital or paid-in surplus. We conclude and hold that the respondent erred in computing earnings and profits by a charge of only fair market value of the property distributed in kind; and that cost should have been charged to earnings and profits.

### B. – Facts Pertaining to the 1936 Distribution of Properties, Inc.

Properties, Inc., was a corporation organized under the laws of the State of Washington on June 7, 1928. It was a personal holding company for the taxable year 1936 within the meaning of the applicable provisions of the revenue laws. It was organized to hold the capital stock of Lumber, Ltd., a Canadian corporation organized in 1907 under the laws of British Columbia.

From June 25, 1913, to June 7, 1928, the capital stock of Lumber, Ltd., consisted of 26,200 shares of common stock with a par value of $100 per share and was owned by M. & R. Co. The basis for the gain or loss upon the sale or other disposition of the common stock of Lumber, Ltd., prior to April 20, 1928, in the hands of M. & R. Co. was $2,987,950.83. On April 20, 1928, 12,000 of the 26,200 shares of the common stock was converted into 12,000 shares of preferred stock

with a par value of $100 per share. The aggregate basis for the common and preferred stock of Lumber, Ltd., in the hands of M. & R. Co. remained $2,987,950.83, of which $1,764,878.22 was allocable to the 14,200 shares of common stock and $1,223,072.11 to the 12,000 shares of preferred stock. After the organization of Properties, Inc., M. & R. Co. transferred to Properties, Inc., the 14,200 shares of common stock and the 12,000 shares of preferred stock of Lumber, Ltd., and thereafter Properties, Inc., owned all the authorized and outstanding stock of Lumber, Ltd.

The capital stock of Properties, Inc., consisted of 12,000 shares of preferred stock with a par value of $100 per share and 14,200 shares of common stock with a par value of $100 per share, thus corresponding to the then capital stock of Lumber, Ltd. The capital stock of Properties, Inc., was held in equal proportions by each of its three stockholders, Merrill Co., Dixmont Co., and Clark L. Ring Corporation, the latter being a holding company for the interests of the Ring family.

It is stipulated and we therefore find that the transactions whereby Properties, Inc., acquired the capital stock of Lumber, Ltd., and whereby Merrill Co. acquired one-third of the capital stock of Properties, Inc., constituted a nontaxable reorganization within the meaning of the applicable revenue laws.

The Merrill interests were originally founded by Thomas Merrill, who died in September 1912. These interests passed to his three children, R. D. Merrill, T. D. Merrill, and Mrs. Clark L. Ring. The latter died shortly after her father in November 1912. Clark L. Ring, who died in 1933, was not active in the management of the affairs of the business. However, he was, prior to July 2, 1932, very much opposed to continuing the operation of the businesses. The management of the businesses was conducted by R. D. Merrill and T. D. Merrill. The latter died on March 25, 1932. Prior to the death of T. D. Merrill, there had been no contraction of the activities of the various corporations and no program to cease the activities of any of these corporations had been agreed upon. With the death of T. D. Merrill, the responsibility for the management of all these corporations fell solely upon R. D. Merrill, who was then 63 years old. The year 1932 had not been a profitable one. Merrill-Ring-Wilson Co., Ltd., a Canadian corporation (hereinafter sometimes referred to as M. R. W, Ltd.), 20 percent of whose capital stock was owned by Lumber, Ltd., was practically in bankruptcy and investments by T. D. Merrill and R. D. Merrill in Campbell Lumber & Timber Co. had not turned out well. M. & R. Co. had lost money in 1932.

On July 2, 1932, after the death of T. D. Merrill, Merrill Co., Dixmont Co., and Clark L. Ring Corporation, being as above found the

stockholders of Properties, Inc., entered into an agreement which was adopted as article XI of the bylaws of Properties, Inc., and was effective as such subsequent to August 22, 1932. The agreement provided, in substance, as follows: That it was considered desirable to adopt a policy of not enlarging the holdings or operations of M. & R. Co., Properties, Inc., and their affiliates, except by unanimous consent of the common stockholders of M. & R. Co. as to operations in Washington and of Properties, Inc., as to operations in Canada, and considered desirable to pursue a policy of proceeding expeditiously with liquidation of all such properties; that in order to carry out such policy it was therefore agreed that, except with unanimous consent of the M. & R. Co., there should be no further purchases or sales of timber or other capital assets (except sale of logs in regular course of business, and except purchase of necessary, and sale of unnecessary equipment); that liquidation and discharge of indebtedness should proceed as rapidly as possible, and liquidation and distribution of capital assets as rapidly as reasonable, without sacrifice of assets; that any funds accumulated should be distributed, unless in the judgment of the trustees it is desirable to postpone distribution temporarily, in which case the funds should be invested in bonds of the United States or Canada; and that the necessary amendments to articles or bylaws should be made immediately, the parties agreeing, if any elects, to enter into a voting trust agreement to carry out the above agreement, the voting trust to continue for 15 years, unless the purposes of the agreement be sooner executed.

After the execution of this agreement on July 2, 1932, the operating companies stopped investing in new timber lands. Lumber, Ltd., did not acquire additional timber or timber lands except for the purchase of one tract of fifty million feet of timber in 1936 for $68,000. This purchase was a minor transaction, which had been contemplated when the agreement was signed. The tract purchased was surrounded by other timber owned by Lumber, Ltd., and its purchase was incidental to and of assistance in the logging of other timber belonging to Lumber, Ltd. As of 1932, M. & R. Co. and Lumber, Ltd., each owned or controlled about half a billion feet of timber. They realized it would require many years to complete their logging operations.

Subsequent to July 2, 1932, Lumber, Ltd., and its subsidiaries continued to log this timber from its own and from leased tracts until the timber was exhausted. M. & R. Co. was dissolved in 1942 and liquidating trustees appointed. As of October 1943, the cutting of timber had almost been completed, only two or three more months work was necessary. The logging equipment of Lumber, Ltd., had been sold about 1940; and by October 1943 only one small tract of timber, which was not feasible to operate, remained. As of October 1943, disposition had not been made of only one tract of timber; the

others were all under contract. The two subsidiaries of Lumber, Ltd., M. R. W. Ltd. (20 percent stock interest) and Vancouver Bay Logging Co., Ltd. (hereinafter referred to as Vancouver, Ltd.) (80 percent stock interest) had disposed of all their machinery by October 1943. A liquidator had been appointed for M. R. W. Ltd. The properties owned by Vancouver, Ltd., had all been logged out with the exception of one 40-acre tract, which was left out inadvertently. New branch roads and branch railroads were built only as they were necessary to log this timber. The dissolution of Properties, Inc., was not intended until the properties of M. R. W. Ltd. and Vancouver, Ltd., had been completely logged out. The program adopted by the operating companies was consistent with the purpose stated in the agreement dated July 2, 1932, and was a practical way of disposing of the physical assets of these companies without sacrificing them.

On July 2, 1932, M. & R. Co. had an authorized capital consisting of 30,000 shares of common stock with a par value of $100 per share and of 7,000 shares of preferred stock with a par value of $100 per share. From August 1, 1933, to November 11, 1935, M. & R. Co. distributed $700,000 to the holders of its preferred stock, thus reducing its par value from $100 per share to zero. It also reduced the par value of its common stock from $100 per share to $80 per share on October 4, 1933, and from $80 per share to $10 per share on March 9, 1942.

The unrealized surplus from appreciation of timber and timber lands of Lumber, Ltd., as of March 1, 1913, was $435,239.50, being the difference between March 1, 1913, value of $3,013,082.50 and cost of $2,577,843. Lumber, Ltd., accumulated a deficit in earnings and profits from March 1, 1913, to December 31, 1934, in an amount of not less than $409,073.17. Its accumulated deficit in earnings and profits on December 31, 1935, was not less than $395,575.50. Its net earnings and profits for 1936, after payment of income taxes, were $146,826.45.

In 1932 Lumber, Ltd., distributed $2,500 to its stockholder, Properties, Inc., and on December 16, 1935, Lumber, Ltd., distributed $117,500 to Properties, Inc. Both of these distributions were made pursuant to the adoption on July 8, 1932, of a resolution by the stockholders of Lumber, Ltd., to reduce the par value of the preferred shares of Lumber, Ltd., from $100 per share to $90 per share. These distributions were regarded by the Commissioner as nontaxable to the stockholder under the applicable provisions of the revenue laws.

On December 22, 1936, Lumber, Ltd., reduced the par value of its preferred stock from $90 per share to $65 per share and distributed $300,000 to Properties, Inc. At the beginning of 1936, Merrill Co. owned one-third of the capital stock of Properties, Inc., such one-third being 4,733⅓ shares of common stock and 3,609 shares of preferred stock. As of January 1, 1936, Properties, Inc., had no accumulated earned surplus. The $300,000 it received from Lumber, Ltd., was the

only taxable income, if any, received by it in 1936. During 1936 Properties, Inc., incurred and paid expenses of $2,502.67. Properties, Inc., distributed the $300,000 it received from Lumber, Ltd., to its stockholders, and Merrill Co. thus received in 1936, $100,000. In June 1936 the owners of all of the preferred stock of Properties, Inc., surrendered such stock to that company, without consideration, for cancellation, and such stock was then canceled.

Additional reductions in the par value of its preferred stock were made by Lumber, Ltd., as follows:

> On March 15, 1937, from $65 to $55 per share;
> On September 2, 1937, from $55 to $27.50 per share;
> On August 26, 1938, from $27.50 to zero per share.

The par value of the common stock of Lumber Ltd., was reduced June 9, 1939, from $100 to $77.50 per share.

Merrill Co. failed to report any part of the $100,000 which it received from Properties, Inc., as taxable dividends in its 1936 income tax return.

OPINION.

Was the distribution from Lumber, Ltd., to Properties, Inc., one in partial liquidation?

Section 115 (i) of the Revenue Act of 1936 defines "partial liquidation," as that term is used in section 115 (c) of the Revenue Act of 1936, as follows: "As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." The holding of this Court in the case of *John K. Beretta*, 1 T. C. 86; affd., 141 Fed. (2d) 452, establishes that the distribution of the $300,000 by Lumber Ltd., to Properties, Inc., was not "a distribution by a corporation in complete cancellation or redemption of a part of its stock" because the reduction of the par value of the stock of Lumber, Ltd., did not result in "complete cancellation or redemption" as required by that part of the definition contained in section 115 (i) of the Revenue Act of 1936. Therefore there was not a partial liquidation under that portion of the above definition thereof.

Was there, however, partial liquidation under the alternative definition as "one of a series of distributions in complete cancellation or redemption of all or a portion of its stock?" This Court in the *Beretta* case, *supra*, at page 94, was careful to point out that if it could be said that "the complete liquidation of the company" was under way or that the distribution in question was "one of a series of distributions to be made in the complete liquidation of the company," "then the fact that none of the corporation's shares were

canceled and retired as a result of the distribution would not be material and the method used of reducing the par value of the stock from $100 to $50 a share would be sufficient and the cases of *Bynum* v. *Commissioner*, 113 Fed. (2d) 1, and *Commissioner* v. *Straub*, 76 Fed. (2d). 388, affirming 29 B. T. A. 216, * * * would be in point * * *." The two cases cited by the Court in the *Beretta* case involved a distribution in partial liquidation of the distributing corporation.

It appears clear to us that the distribution of the $300,000 by Lumber, Ltd., was "one of a series of distributions in complete cancellation or redemption of all * * * of its stock," and thus in partial liquidation. The following table shows the distributions made by Lumber, Ltd., since 1932 in reduction of the par value of its preferred stock:

| Reduced per share— | | Date of corporate resolution | Date of distribution | Amount distributed |
|---|---|---|---|---|
| From— | To— | | | |
| $100. 00 | $90. 00 | July 8, 1932 | 1932 | $2,500 |
| | | | Dec. 16, 1935 | 117,500 |
| 90. 00 | 65. 00 | Dec. 22, 1936 | Dec. 22, 1936 | 300,000 |
| 65. 00 | 55. 00 | Mar. 15, 1937 | Mar. 15, 1937 | 120,000 |
| 55. 00 | 27. 50 | Sept. 2, 1937 | Sept. 2, 1937 | 330,000 |
| 27. 50 | Nothing | Aug. 26, 1938 | Aug. 26, 1938 | 330,000 |

It is not necessary that there be an intent to liquidate the corporation completely and cease business in order for there to be a partial liquidation of a corporation. In *Hamilton Allport*, 4 T. C. 401, we said:

* * * The statute applies not to a distribution in liquidation of the corporation or its *business*, but to a distribution in cancellation or redemption of a part of its *stock*.

To the same effect is *John K. Beretta, supra,* at pages 94 and 95, citing with approval *Commissioner* v. *Quackenbos*, 78 Fed. (2d) 156. Accord: *Commissioner* v. *Cordingly*, 78 Fed. (2d) 118; *Benjamin R. Britt*, 40 B. T. A. 790, 796, 797; affd., 114 Fed. (2d) 10. However, even if it were necessary, we are of the opinion that there is ample evidence in the record of this case to justify the conclusion that Lumber, Ltd., was in the process of complete liquidation during 1936 and 1937.[3]

This Court stated in *T. T. Word Supply Co.*, 41 B. T. A. 965, as follows (pp. 980–981):

* * * The liquidation of a corporation is the process of winding up its affairs by realizing upon its assets, paying its debts, and appropriating the amount of its profit and loss. It differs from normal operation for current profit in that it ordinarily results in the winding up of the corporation's affairs, and there must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined

---

[3] The taxable year 1937 is in question in the related cases, Docket Nos. 112515 and 112517.

thereto. A mere declaration is not enough and the question whether a corporation is in liquidation is one of fact.

This Court has also quoted with approval the statement made in the case of *Horn & Hardart Baking Co.* v. *United States*, 34 Fed. Supp. 89, to the effect that the decisive factor is "whether the distribution was made with intent to maintain the corporation as a going concern or with the intent to liquidate the business." *Isaac W. Frank Trust of 1927*, 44 B. T. A. 934, 947. See also *Rollestone Corporation*, 38 B. T. A. 1093, 1105. We believe the facts in the instant case meet the requirements of these expressions.

It is not important that part of the distributions might be considered to have been from the earnings and profits for the year 1936, in the amount of $146,826.45, which Lumber, Ltd., had during that year. *Hellmich* v. *Hellman*, 276 U. S. 233; *Holmby Corporation* v. *Commissioner*, 83 Fed. (2d) 548. Nor is it conclusive that Lumber, Ltd., was not dissolved immediately after the particular distribution here in question. *Rheinstrom* v. *Conner*, 125 Fed. (2d) 790. Furthermore, it is to be noted that the Commissioner does not contend that the distribution of the $300,000 was a cancellation or a redemption by Lumber, Ltd., of its stock "at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend" within the meaning of section 115 (g) of the Revenue Act of 1936. His contention is that the distribution was a taxable dividend within the meaning of section 115 (a) and (b).

We are of the opinion that the distribution of the $300,000 fell within the orbit of section 115 (c) and (i) of the Revenue Act of 1936. We do not deem it necessary to analyze in detail the many factors which affect our decision. Suffice it to point out that the original purpose is stated in the agreement of July 2, 1932. Such an agreement is not conclusive, but it is entitled to weight in seeking the solution to a problem which involves a question of fact upon which the intention of the board of directors of the distributing corporation has great materiality. We should also bear in mind the broad extent of the holdings of Lumber, Ltd. We should not, without good reason, overrule the judgment of the liquidators of such an enterprise. The length of time which may reasonably be required to liquidate the assets of the corporation as well as the determination of the manner of liquidation are matters soundly left to the discretion of the liquidators, who are charged with a duty of effecting a liquidation in such time and in such manner as will inure to the best interests of the corporation's stockholders. The facts show ample reason for Lumber, Ltd., to have decided upon a policy of liquidation: The death of one of the two key men in charge of

these interrelated corporations; decline in business; and the opposition of Clark L. Ring to the continued operation of the businesses. The facts show that, although the liquidating process may have been slow and although operations pursuant to the determined course of liquidation may have resulted in annual profits, nevertheless, without exception, the activities of Lumber, Ltd., were consistent with the ultimate liquidation and dissolution of the corporation. No new timber lands were acquired to replace depleted assets. The gradual contraction of the company's activities and their eventual disappearance was the inevitable result of the policy pursued by Lumber, Ltd. As of the date of the trial of this case in October 1943, the liquidation of Lumber, Ltd., was practically complete. All of its machinery and logging equipment had been sold. Only one small tract of timber, which it was not feasible to operate, remained. Its two subsidiaries, M. R. W. Ltd. and Vancouver, Ltd., had sold their machinery and their liquidation was almost complete.

That the process of liquidation may extend over a period of many years has been held by this Court not to be fatal to a finding that a distribution may be one of a series of distributions in complete liquidation of a corporation. The corporation in the case of *T. T. Word Supply Co.*, *supra*, was in the process of complete liquidation from 1926 through and including 1934 and the Court held that withdrawals during the period from 1926 to 1932 "must therefore be regarded as a series of distributions intended to be in complete liquidation of the corporation." See also *Gaston & Co.*, 39 B. T. A. 640, wherein this Court recognized that the corporation there involved had been in the process of liquidation since 1930, even though it appeared that at the time of this Court's decision in that case in 1939 the corporation was still engaged in liquidating its affairs and capital.

Respondent relies upon the case of *W. E. Guild*, 19 B. T. A. 1186. We consider that case to be distinguishable on its facts from the instant cases for the same reasons stated by us in the case of *James P. Gossett*, 22 B. T. A. 1279, 1285, where it was pointed out that "it was apparent that the intention [in the *Guild* case] of 1915 to liquidate and dissolve was later changed." A comparison of the facts set forth in the *Guild* case with the facts in the instant cases further demonstrates that the *Guild* case is not controlling here. The facts in the *Gossett* case were said to have created a situation "palpably different in genesis and scope from the revival of business shown in the *Guild* case," and not to have been "sufficient to indicate a departure from the plan of liquidation." We are of the opinion that the facts in the instant cases similarly do not indicate a departure from the plan of liquidation. We do not believe that the fact that Lumber, Ltd., could not complete its dissolution until after its subsidiaries had been dissolved, compels a different result.

We conclude that the distribution of $300,000 by Lumber, Ltd., to Properties, Inc., in 1936 constituted a distribution in partial liquidation within the meaning of section 115 (c) and (i) of the Revenue Act of 1936. Therefore, in accordance with paragraph 43 of the stipulation filed in Docket No. 101456, we further conclude that the $300,000 did not constitute earnings or profits in the hands of Properties, Inc., and that no portion of the $100,000 received by Merrill Co. as a distribution from Properties, Inc., in 1936 is subject to tax as an ordinary dividend.

### C. – Facts Pertaining to the 1936 Distributions of M. & R. Co.

M. & R. Co. was a corporation organized under the laws of the State of Washington on March 15, 1901. On December 31, 1935, its outstanding capital stock consisted of 30,000 shares of common stock with a par value of $80 per share. On March 1, 1913, M. & R. Co. had an earned surplus earned prior to March 1, 1913, of $81,754.29 and an unrealized surplus from appreciation of timber and timber lands of $301,327.30. As of December 31, 1931, M. & R. Co. had no earned surplus earned prior to March 1, 1913, and its March 1, 1913, unrealized surplus from appreciation of timber and timber lands had become $240,295.48. During 1932 M. & R. Co. sustained an operating loss of $72,103.44 and its deficit in earnings and profits as of December 31, 1932, was $91,279.06. This was an operating loss, no portion of which was incurred by reason of the sale of timber or timber lands which had been acquired by the corporation prior to March 1, 1913. From 1933 to 1935, inclusive, M. & R. Co. had earnings and profits in excess of income taxes of $280,169.75 and during those years it distributed as taxable dividends on its preferred stock $86,071.05. During 1936 M. & R. Co. had net earnings, after income taxes, of $133,071.65 and it distributed $100,000 to each of its three stockholders, one of which was Merrill Co.

In its income tax return for 1936 Merrill Co. returned the entire $100,000 which it received from M. & R. Co. as taxable dividends, but now alleges that only part of the $100,000 is taxable as dividends.

### OPINION.

Is the $100,000 taxable to Merrill Co. as a dividend, under section 115 of the Revenue Act of 1936; or is a deficit in accumulated earnings and profits to be charged against subsequent earnings and profits, thus leaving them insufficient to cover the $100,000 as a dividend?

We held above that in the determination of the amount of accumulated earnings and profits of T. D. Inc. available for distribution as dividends as of December 31, 1935, net operating losses incurred subsequent to February 28, 1913, were not to be charged against the

earnings and profits of T. D. Inc. for years subsequent to December 31, 1926. T. D. Inc. was organized prior to March 1, 1913. The operating losses of T. D. Inc. were incurred by reason of the sale of timber lands at March 1, 1913, appreciated values, which appreciated values exceeded cost of the lands sold by an amount equal to, if not greater than, the losses incurred. The authority upon which we relied was *Loren D. Sale*, 35 B. T. A. 938.

The question here is whether the result should be different in the case of the distributions by M. & R. Co., which was also organized prior to March 1, 1913, because of the fact that no part of the operating losses of M. & R. Co. was incurred by reason of the sale of any timber or timber lands or other property which had been acquired prior to March 1, 1913. The respondent does not argue the question, except to submit that the legal question here is in all material respects the same as presented in the matter of T. D. Inc., on the question of charge of operating losses against later earnings and profits, from which we understand him to rely upon *Helvering* v. *Canfield*, 291 U. S. 163, and the *Sale* case, *supra*. We do not think they here apply. The pre-March 1, 1913, surplus, against which operating losses were charged in the *Canfield* case, was an earned surplus. Here there is nothing, except an unrealized appreciation in property values, prior to March 1, 1913, which continued unrealized until the crucial period, no disposition having been made of the property appreciated. It is clear, we think, that nothing had been added to the corporate earnings and profits after March 1, 1913, which could absorb operating losses. The *Sale* case presented altogether a different question, for there the loss arose from disposition of the property held prior to March 1, 1913.

Therefore, we hold that the $91,279.06 deficit at the end of 1932 should be charged against subsequent earnings in determining the earnings and profits available for payment of taxable dividends. We therefore, in accordance with paragraph No. 56 of the stipulation filed in Docket No. 101456, further find that the accumulated earnings and profits of M. & R. Co. since March 1, 1913, as of December 31, 1935, available for dividends were $102,819.64, and, accordingly, hold that the distribution of $100,000 received by Merrill Co. in 1936 from M. & R. Co. is taxable under section 115 to the extent of $78,630.43.

## II.

*Docket No. 112515—Estate of Eula Lee Merrill.*

*Docket No. 112517—R. D. Merrill.*

### FINDINGS OF FACT.

We adopt the stipulation of facts filed in these two cases. Such parts thereof as are considered necessary to clarification of the issues

are set forth with the following findings, made also from evidence adduced at the hearing.

Richard Dwight Merrill, hereinafter sometimes called R. D. Merrill, is an individual whose residence during 1937 was in Seattle, Washington. He filed his income tax return for the calendar year 1937 with the collector of internal revenue for the district of Washington at Tacoma, Washington. During 1937 he was the owner of 3,600 shares of preferred stock and 2,800 shares of common stock of Merrill Co.

Eula Lee Merrill was a resident of Seattle, Washington, during all of 1937 and thereafter until her death on April 9, 1938. R. D. Merrill is the duly appointed, qualified, and acting executor of the estate of Eula Lee Merrill. The income tax return for 1937 of Eula Lee Merrill was also filed with the collector at Tacoma, Washington. During 1937 Eula Lee Merrill was the owner of 3,600 shares of preferred stock and 2,800 shares of common stock of Merrill Co.

On January 1, 1935, the paid-in surplus of Merrill Co. was $2,032,049.29 and its accumulated earnings and profits, $218,029.01. Its net income for the calendar year 1935, after payment of income taxes, was $1,898.97. On November 13, 1935, Merrill Co. distributed to its common stockholders 3,488¾ shares of the capital stock of Campbell River Timber Co., having a then cost basis of $290,062.50 and a fair market value on the date of distribution of $23,723.93. The accumulated earnings and profits of Merrill Co. on December 31, 1935, were zero.[4] On December 15, 1936, Merrill Co. made a cash distribution to its preferred stockholders of $110,000 and to its common stockholders of $10,000.

On December 29, 1937, Merrill Co. made a cash distribution to its preferred stockholders of $158,500 and to its common stockholders of $100,000. Of said distribution, R. D. Merrill and Eula Lee Merrill each received $85,060, being $57,060 on the preferred stock and $28,000 on the common stock. The taxability of this distribution is in issue.

During 1937 T. D. Inc. had a net income of $14,454.36 after payment of 1937 income taxes. On February 15, 1937, T. D. Inc. distributed to its stockholders in kind 250 units of the capital stock of Olympic Forest Products, Inc., having a then cost basis of $24,494.52 and a fair market value on the date of distribution of $53,750. Merrill Co. received one-half of that distribution.[5] T. D. Inc. also made a cash distribution to its stockholders on July 7, 1937, amounting to $13,000, of which distribution Merrill Co. received $6,500.

On December 31, 1936, M. & R. Co. had no accumulated earnings and profits since March 1, 1913, under our holding above. The net earnings of M. & R. Co. for 1937, after payment of income taxes, amounted

---

[4] See opinion, *infra,* following our conclusions in Merrill Co.

[5] See opinion, *infra.*

to $112,827.83. On February 17, 1937, M. & R. Co. distributed to its common stockholders 500 units of the capital stock of Olympic Forest Products, Inc., having a then cost basis of $48,989.04 and a fair market value on the date of distribution of $107,500. Merrill Co. received one-third of that distribution. On March 13, 1937, M. & R. Co. made a cash distribution to its common stockholders of $90,000 and on July 27, 1937, of $180,000 to its common stockholders. Merrill Co. received one-third of these distributions.

On December 31, 1936, Lumber, Ltd., had earnings and profits accumulated since March 1, 1913, amounting to a deficit of not less than $248,749.05.[6] In 1937 Lumber, Ltd., had net earnings of $142,994.60, after payment of income taxes. On March 15, 1937, Lumber, Ltd., reduced the par value of its 12,000 shares of preferred stock from $65 to $55 per share and distributed $10 per share or $120,000 to its stockholder, Properties, Inc. The certificate for 12,000 shares of preferred stock of Lumber, Ltd., was endorsed to show the reduction in par value of each share from $65 to $55 par value. On September 2, 1937, Lumber, Ltd., further reduced the par value of its 12,000 shares of preferred stock from $55 per share to $27.50 per share, and distributed $27.50 per share, or $330,000 to its stockholder, Properties, Inc.

The distributions, totaling $450,000, described above, from Lumber, Ltd., were the only sums of money or other property received by Properties, Inc., in 1937. The expenses of Properties, Inc., for 1937 amounted to $2,456.89. On March 19, 1937, Properties, Inc., distributed $120,000 to its common stockholders and on September 14, 1937, $330,000 to its common stockholders. Merrill Co. received one-third, or $150,000, as a result of these distributions.

R. D. Merrill and the estate of Eula Lee Merrill each paid to the collector of internal revenue at Tacoma, Washington, the sum of $10,496.69 during 1938 as 1937 income taxes.

### OPINION.

Although the taxes involved in these two cases are for the year 1937, the same provisions of the Revenue Act of 1936, set forth in the margin above, are applicable. We do not deem it necessary to restate or discuss at great length any of the legal questions involved in these cases, as they have all been covered and discussed in connection with our opinion in Docket No. 101456. For the sake of clarity, we shall merely summarize below our opinion as to each of the issues presented, which, when so resolved, determine the taxability of the two individuals involved in these two cases.

1. We are of the opinion and hold that the distribution in kind made by Merrill Co. on November 13, 1935, to its common stockholders

---

[6] See opinion, *infra.*

of 3,488¾ shares of the Campbell River Timber Co. should be charged against the accumulated earnings and profits of the distributing company at cost, and therefore we find as a fact, in accordance with paragraph 7 of the stipulation filed in Docket Nos. 112515 and 112517, that the accumulated earnings and profits of Merrill Co. on December 31, 1935, were zero.

2. The parties are in agreement as to the result of the distribution in kind by T. D. Inc. of stock of Olympic Forest Products, Inc., in 1937, having a cost basis of $24,494.52 and a fair market value of $53,750 on date of distribution; also as to the result of distribution in kind by M. & R. Co. of stock in Olympic Forest Products, Inc., in 1937 having a cost basis of $48,989.04 and fair market value of $107,500 at date of distribution. Though they do not agree on the method of arriving at the result, they agree in effect that earnings and profits for purposes of future distribution should be charged with an amount equal to cost. Finding such agreement as to result, though not in method, we deem it unnecessary to discuss the question whether there is difference between the situation here presented (where fair market value at distribution is more than cost), and that hereinabove considered where fair market value at date of distribution was less than cost. We hold, in accordance with the agreement of the parties, that in both cases the distribution of the stock in Olympic Forest Products, Inc., should be charged to earnings and profits at cost.

3. We are of the opinion and hold that the distribution in 1937 of $450,000 in cash by Lumber, Ltd., to Properties, Inc., was one of a series of distributions, within the meaning of section 115 (c) and (i) of the Revenue Act of 1936. In accordance with our opinion in Docket No. 101456, we further hold that the distributions in Docket Nos. 112515 and 112517, by Properties, Inc. (of the sums it received from Lumber, Ltd.), to its stockholder, Merrill Co., was a return of capital to Merrill Co.

4. In accordance with our decision in Docket No. 101456, we hold that in determining the earned surplus of T. D. Inc. as of December 31, 1936, net operating losses of $17,187 sustained during the period from March 1, 1913, to December 31, 1926, should not be charged against subsequent earnings, and the distribution in kind made by T. D. Inc. in 1936 should be charged against earned surplus at cost.

5. We find that M. & R. Co. on December 31, 1936, had no accumulated earnings and profits since March 1, 1913, in accordance with paragraph 15 of the stipulation filed in Docket Nos. 112515 and 112517, because we held in our opinion in Docket No. 101456 that the deficit at the end of 1932 of $91,279.06, of M. & R. Co. should be charged against subsequent earnings.

6. We find that Lumber, Ltd., on December 31, 1936, had accumulated earnings and profits since March 1, 1913, amounting to a deficit

of not less than $248,749.05, in accordance with paragraph 19 of the stipulation filed in Docket Nos. 112515 and 112517, because we held in our opinion in Docket No. 101456 that the distribution of $300,000 by Lumber, Ltd., to Properties, Inc., in 1936, was one of a series of distributions, within the meaning of section 115 (c) and (i) of the Revenue Act of 1936.

Reviewed by the Court.

*Decisions will be entered under Rule 50 in Docket Nos. 101456, 112515, and 112517.*