*Decision will be entered under Rule 50.*

GEORGE M. GROSS AND ANNA GROSS, ET AL.,* PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 46260–46270. Filed January 31, 1955.

---

*Proceedings of the following petitioners are consolidated herewith : Alan Morton, Docket No. 46261 ; Robert Gross, Docket No. 46262 ; Norman Newhouse and Alice Newhouse, Docket No. 46263 ; Richard Morton and Margaret Morton, Docket No. 46264 ; James Morton, Docket No. 46265 ; Lawrence Morton and Irma Morton, Docket No. 46266 ; Peter Gross Trust, Alfred Gross, Trustee, Docket No. 46267 ; Alfred Gross and Florence Gross, Docket No. 46268 ; Gerald Gross Trust, Nathan Felberbaum, Trustee, Docket No. 46269 ; Jane Gross Trust, Alfred Gross, Trustee, Docket No. 46270.

*Harry J. Rudick, Esq.*, and *Mason G. Kassel, Esq.*, for the petitioners.

*Clay C. Holmes, Esq., Robert A. Bridges, Esq.*, and *Frank Cohen, Esq.*, for the respondent.

OPINION.

TIETJENS, *Judge:* These consolidated proceedings contest deficiencies for 1948 and 1949 determined as follows:

| | 1948 | 1949 |
|---|---|---|
| George M. Gross and Anna Gross | $72,022.17 | $643,804.63 |
| Alan Morton | 13,445.86 | 86,906.30 |
| Robert Gross | 13,411.92 | 86,455.91 |
| Norman and Alice Newhouse | _____ | 91,767.68 |
| Richard and Margaret Morton | 10,201.70 | 68,710.36 |
| James Morton | 13,623.75 | 87,469.70 |
| Lawrence and Irma Morton | 67,126.57 | 641,696.62 |
| Peter Gross Trust | 17,890.31 | 104,480.30 |
| Alfred Gross and Florence Gross | 77,411.33 | 698,345.32 |
| Gerald Gross Trust | 13,510.55 | 82,419.63 |
| Jane Gross Trust | 17,790.21 | 103,761.69 |

The facts are stipulated and are so found and the exhibits are incorporated by this reference.

The petitioners George M. Gross and Anna Gross are husband and wife. They reside at Sands Point on Long Island, New York. They have three children, Robert, Gerald, and Alice Gross Newhouse. Alfred Gross is a brother of George. Florence Gross is the wife of Alfred. Alfred and Florence have two children, Jane and Peter. Irma Morton is a sister of George and Alfred Gross. Lawrence Morton is her husband. They have three children, James, Alan, and Richard.

The income tax returns of all the petitioners were filed with the collector of internal revenue at Brooklyn, New York. Joint returns for 1948 and 1949 were filed by George M. and Anna Gross, Richard and Margaret Morton, Lawrence and Irma Morton, and Alfred and Florence Gross. Joint returns for 1949 were filed by Norman and Alice Newhouse. Individual returns for 1948 and 1949 were filed by Alan Morton, Robert Gross, and James Morton. Fiduciary returns were filed by the trustees of the Peter Gross Trust, Gerald Gross Trust, and Jane Gross Trust.

For a number of years prior to 1948 George and Alfred Gross and Lawrence Morton were builders, principally of 1-family houses.

758

The Federal Housing Administration was created to encourage and develop the expansion of privately owned and privately financed housing.

First Mars Homes, Inc., Second Mars Homes, Inc., Third Mars Homes, Inc., and Fourth Mars Homes, Inc., all of which are Maryland corporations, were organized in 1943 to own and operate sections of a housing project in Baltimore County, Maryland, to be occupied by individuals engaged in defense work and their families. George M. Gross, Alfred Gross, and Lawrence Morton each owned 25 per cent of the stock. This project was completed in 1944. It was financed by mortgages insured by the Federal Housing Administration.

Upon the termination of World War II and the subsequent release of veterans from the Armed Forces, it became apparent that there existed an extreme shortage of housing facilities in the United States. This was caused in part by the facts that (a) many members of the armed services had married during the war, thus increasing the need for additional housing facilities, and (b) during the period of World War II, the construction of private houses and apartment dwellings had been curtailed.

Glen Oaks Village is a privately owned 2-story garden-type apartment development consisting of 134 2-story brick buildings containing 2,928 apartments. Its cost of construction was financed by mortgage loans made by the Bank of Manhattan Company, which mortgage loans were insured by the Federal Housing Administration under section 608 of the National Housing Act, as amended.

At the time the plan for the construction of Glen Oaks Village was conceived, the land on which the village was constructed was owned by three corporations controlled by the Gross and Morton families, namely, Permanent Land Corporation, Union Land Corporation, and Wenton Realty Corporation, all of which were organized under the laws of the State of New York.

The planning, financing, and building of Glen Oaks Village was under the general direction of George M. Gross, Alfred Gross, and Lawrence Morton. George M. Gross was primarily responsible for management, Alfred Gross for financing, and Lawrence Morton for construction of the project. None of the three devoted his entire time to the project.

Representatives of the Gross and Morton interests began negotiations in 1946 with the Bank of Manhattan Company for the issuance of mortgage loans to be used in financing the construction of Glen Oaks Village. The Federal Housing Administration was agreeable to the building of this project because of the extreme shortage of housing facilities for returning veterans in the metropolitan New York district and because at that time builders of large housing develop-

ments were generally unwilling to construct apartment-type housing projects.

The procedure of the Federal Housing Administration in determining whether it would insure mortgages under section 608 of the National Housing Act, as amended, was as follows:

(a) The proposed mortgagor first made an application to a lending institution for a loan;

(b) The proposed mortgagor was required to arrange for temporary financing by way of building loan agreements and for permanent financing by way of mortgages by a lending institution;

(c) As part of its application to a lending institution for a loan, the proposed mortgagor was required to submit a site plan containing a sketch of the project, detailed information showing the plan of construction and operation, an estimate of rental income and operating expenses, and an estimate of replacement cost of the property. The Federal Housing Administration was permitted to insure mortgages in the amount of 90 per cent of its total estimated replacement cost of the property, but the amount of the mortgage to be insured could not exceed $1,800 per room, which was later changed to $8,100 per apartment;

(d) The detailed information was then submitted by the proposed mortgagee to the Federal Housing Administration and was examined and evaluated by the Federal Housing Administration's architectural, valuation, and mortgage risk examining sections;

(e) The proposed mortgagee then applied to the Federal Housing Administration for mortgage insurance and if such mortgage insurance were approved, construction was commenced. Construction was inspected by Federal Housing Administration employees; insured building loan advances could not be disbursed by the lender without the consent of the Federal Housing Administration; and rents were frozen at the amount determined by the Federal Housing Administration;

(f) The Federal Housing Administration received from the mortgagee an examination fee of three-tenths of 1 per cent of the principal amount of the mortgage insured and an annual premium for such mortgage insurance of one-half of 1 per cent of the existing mortgage indebtedness.

The project known as Glen Oaks Village was constructed in two parts. Part I, consisting of 576 apartments covering approximately 25 acres of land, was erected by Glen Oaks Village, Inc., a New York corporation organized on April 8, 1947, on land leased from Permanent Land Corporation under indenture of lease dated May 1, 1947. The certificate of incorporation of Glen Oaks Village, Inc., followed the model form of Certification of Incorporation prepared by the Federal Housing Administration.

The lease between Permanent Land Corporation and Glen Oaks Village, Inc., was for an initial term of 50 years with a right of renewal on the part of the lessee for an additional period of 50 years. The rent paid by the lessee to the lessor under the lease was computed at 4 per cent of the value of the land as appraised by the Federal Housing Administration.

In November 1946, the Gross and Morton interests submitted a site plan to the Bank of Manhattan Company for the erection of part I of Glen Oaks Village which was approved by Federal Housing Administration.

Early in 1947, Glen Oaks Village, Inc., as proposed mortgagor, and the Bank of Manhattan Company, as proposed mortgagee, submitted to the Federal Housing Administration an application for mortgage insurance in the amount of $4,334,000 on F. H. A. Form No. 2013w to cover the construction of part I of Glen Oaks Village. This was approved by the Federal Housing Administration on March 31, 1947. The amount of mortgage insurance was subsequently increased to $4,348,400.

On April 18, 1947, it was agreed between Glen Oaks Village, Inc., the Bank of Manhattan Company, and the Prudential Insurance Company of America that upon the completion of construction of part I of Glen Oaks Village, Inc., the Bank of Manhattan Company which was providing temporary financing under a building loan agreement and mortgage would assign the mortgage to the Prudential Insurance Company of America upon payment to the bank of the principal amount of the mortgage plus a premium of 3½ per cent of the principal amount of the mortgage payable to Glen Oaks Village, Inc.

On June 2, 1947, Glen Oaks Village, Inc., entered into a building loan agreement with the Bank of Manhattan Company under which the Bank of Manhattan Company agreed to advance the sum of $4,348,400 to be used for the purpose of constructing part I of Glen Oaks Village; the building loan agreement also provided that the amount was to be secured by a bond and mortgage, which mortgage was to be insured by the Federal Housing Administration under the provisions of the National Housing Act, as amended.

On June 2, 1947, pursuant to the above agreement, Glen Oaks Village, Inc., executed a mortgage on its leasehold in favor of the Bank of Manhattan Company in the amount of $4,348,400.

On June 2, 1947, the Federal Housing Administration insured such mortgage of $4,348,400 pursuant to the provisions of section 608 of the National Housing Act, as amended, and the Administrative Rules and Regulations for Rental Housing Insurance under section 608 of the National Housing Act issued by the Federal Housing Admin-

istration. The first annual premium for such insurance paid to the Federal Housing Commissioner was $21,742.

On March 18, 1948, Glen Oaks Village, Inc., and the Bank of Manhattan Company filed an amended application with the Federal Housing Administration requesting increased mortgage insurance due to changes in the plan and amendments to the National Housing Act. The application was subsequently approved by Federal Housing Administration which insured an additional mortgage on part I of Glen Oaks Village in the amount of $303,600. The total mortgage on part I of Glen Oaks Village insured by Federal Housing Administration was $4,652,000.

The amount of $4,652,000 was advanced by the Bank of Manhattan Company during the period July 1, 1947, through November 26, 1948. On the latter date, $726,526 was advanced which, with the amounts previously advanced, aggregated total mortgage moneys received from the Bank of Manhattan Company of $4,652,000.

The construction of part I of Glen Oaks Village was commenced in March 1947. It was constructed in units and the first tenants commenced occupancy in October 1947; it was completed in July 1948.

Part II of Glen Oaks Village consisting of 2,352 apartments covering approximately 100 acres of land was erected on land formerly owned by Union Land Corporation and Wenton Realty Corporation. In the early part of 1948, with the approval of the Federal Housing Administration, portions of such land were conveyed to Permanent Land #2 Corporation, Permanent Land #3 Corporation, Permanent Land #4 Corporation, Permanent Land #6 Corporation, Permanent Land #7 Corporation, Permanent Land #9 Corporation, Permanent Land #11 Corporation, Permanent Land #12 Corporation, Permanent Land #13 Corporation and Permanent Land #15 Corporation. The reasons for such conveyances were (1) the Federal Housing Administration was not authorized to insure a mortgage over $5,000,-000 and it was believed that the cost of construction of part II would be in the neighborhood of $20,000,000; (2) part II was to be built in unitary sections, the average cost of each being about $2,000,000; and (3) mortgage financing could be more easily secured by having a separate corporation for each section.

Part II of Glen Oaks Village was developed and constructed pursuant to a method specifically approved by the Federal Housing Administration which was as outlined in the following seven paragraphs.

Separate corporations, namely, Glen Oaks Village #2, Inc., Glen Oaks Village #3, Inc., Glen Oaks Village #4, Inc., Glen Oaks Village #6, Inc., Glen Oaks Village #7, Inc., Glen Oaks Village #9, Inc., Glen Oaks Village #11, Inc., Glen Oaks Village #12, Inc., Glen Oaks Village #13, Inc., and Glen Oaks Village #15, Inc., were organized. Each of these was to lease a respective section of land,

to construct apartments thereon, and to manage and operate the section so constructed. The certificate of incorporation of each of these corporations was patterned on the model form of Certification of Incorporation issued by the Federal Housing Administration.

Each of these numbered operating corporations leased the land owned by the correspondingly numbered Permanent Land Corporation.

The leases were for a term of 99 years with a right of renewal on the part of the lessee for an additional period of 99 years. The rent paid under each lease was computed at 4 per cent of the value of the land as appraised by the Federal Housing Administration.

Each of the operating companies then entered into a building loan agreement with the Bank of Manhattan Company under which the bank agreed to advance designated amounts to be used for the purpose of constructing the respective unitary section of part II of Glen Oaks Village by the respective operating company; each of such building loan agreements also provided that the amounts to be advanced by the Bank of Manhattan Compay were to be secured by a bond and mortgage on the leasehold, which mortgage was to be insured by the Federal Housing Administration under the provisions of the National Housing Act, as amended.

Thereafter, each of the operating companies executed a mortgage on its leasehold in favor of the Bank of Manhattan Company. Each of such mortgages was insured by the Federal Housing Administration pursuant to provisions of section 608 of the National Housing Act, as amended.

The mortgage money for the mortgages was advanced by the Bank of Manhattan Company during the period May 1948 through November 1949.

Upon completion of the construction of each unitary section the mortgage executed by the Glen Oaks Village operating company was assigned by the Bank of Manhattan Company. The mortgages of companies #2, 3, 4, 6, 7, 9, and 11 were assigned to the Prudential Insurance Company. Those of companies #12, 13, and 15 were assigned to the New York State Employees' Retirement System.

The construction of part II of Glen Oaks Village was commenced in February 1948. It was constructed in units and the first tenants commenced occupancy in November 1948; it was completed prior to December 1949.

Each of the Glen Oaks Village operating companies issued 100 shares of preferred stock of the par value of $1 per share, to the Federal Housing Administration. Such preferred stock was issued to the Federal Housing Administration as a prerequisite to the securing of mortgage insurance. Its purpose was to allow Federal

Housing Administration to control each corporation if and when a default occurs under the mortgage.

The Permanent Land corporations had no mortgage loans guaranteed by Federal Housing Administration. On October 19, 1949, each of the Permanent Land corporations executed bonds secured by first mortgages on its land dated October 19, 1949, in favor of Teachers Insurance and Annuity Association of America and received mortgage proceeds.

Seton Realty Corporation is a New York corporation organized in November 1946 to develop and own a shopping center for part I of Glen Oaks Village. It had no transactions with the Federal Housing Administration. In July 1948 Seton borrowed $240,000 from Massachusetts Life Insurance Company secured by a first mortgage on its real property. The real property consisted of land having a cost basis of $5,628 and store buildings which were completed in July 1948 at a cost of $171,456.65.

Glen Oaks Shopping Center, Inc., is a New York corporation organized in 1948 to develop and own a shopping center for part II of Glen Oaks Village. It had no transactions with the Federal Housing Administration.

The above-mentioned corporations were owned or controlled by members of the Gross and Morton families. The number of shares of common stock held by or for each member of the families in the taxable years is stipulated. These corporations kept their books and filed tax returns on the basis of a fiscal year ending March 31, except that Permanent Land Corporation and Seton Realty Corporation were on a calendar year basis and Permanent Land #2 Corporation and Permanent Land #6 Corporation were on the basis of a fiscal year ending February 28.

In 1948 Glen Oaks Village, Inc., Seton Realty Corporation, First Mars Homes, Inc., and Second Mars Homes, Inc., made cash distributions to their stockholders. In 1949 all the other Glen Oaks Village corporations, all the Permanent Land corporations, Seton Realty Corporation, Third Mars Homes, Inc., and Fourth Mars Homes, Inc., made distributions in cash to their stockholders in proportion to the stockholdings of the distributees. The amounts of the distributions are stipulated.

On March 15, 1949, Glen Oaks Shopping Center, Inc., made a distribution to its stockholders of undivided interests in vacant land in proportion to their stockholdings. At the time of this distribution the corporation had no accumulated earnings or profits for the year of distribution or prior years. Glen Oaks Shopping Center, Inc., did not write up the value of its real estate.

Prior to the cash distributions described, the distributing corporations on their books wrote up the value of their real estate by amounts which were equal to or in excess of the distributions. The amounts of such write-ups were credited on the corporations' books to accounts denominated Surplus Arising from Realty Appreciation. This real estate is still owned by the distributing corporations.

At the time of the distributions each stockholder had held his stock for more than 6 months.

The shares of stock were not held by any stockholder as stock in trade or other property of a kind which would properly be included in inventory if on hand at the close of the taxable year nor were they property held primarily for sale to customers in the ordinary course of any stockholder's trade or business.

In relation to the corporations here involved, George M. Gross, Alfred Gross, and Lawrence Morton acted in their individual capacities and not as a partnership or association. During the taxable years 1948 and 1949, the books and records of these corporations did not show the voting or payment of any salaries to the three named individuals. In 1950 these three individuals each received compensation of $25,000 from Glen Oaks Shopping Center, Inc., covering services from 1948 to the date of payment.

The corporations here involved are still in existence and at all times have been owned or controlled by the members of the Gross and Morton families.

The several Permanent Land corporations made distributions on November 2, 1949, of proceeds of mortgages. The following table shows the amount of the mortgage and the amount distributed in 1949 to the stockholders of each of these companies:

| | Amount of mortgage | Amount of distribution |
|---|---|---|
| Permanent Land Corporation | $427,500 | $260,000 |
| Permanent Land #2 Corporation | 188,100 | 123,000 |
| Permanent Land #3 Corporation | 131,400 | 85,000 |
| Permanent Land #4 Corporation | 118,800 | 60,000 |
| Permanent Land #6 Corporation | 285,030 | 144,000 |
| Permanent Land #7 Corporation | 332,280 | 185,000 |
| Permanent Land #9 Corporation | 300,780 | 181,000 |
| Permanent Land #11 Corporation | 194,130 | 130,000 |
| Permanent Land #12 Corporation | 145,170 | 100,000 |
| Permanent Land #13 Corporation | 149,760 | 100,000 |
| Permanent Land #15 Corporation | 193,500 | 132,000 |

The distributions by the other corporations were in the following amounts:

| Year paid | | Total distributions to common stockholders |
|---|---|---|
| 1948 | Glen Oaks Village, Inc. | $800,000 |
| | First Mars Homes, Inc. | 40,000 |
| | Second Mars Homes, Inc. | 40,000 |
| | Seton Realty Corporation | 60,000 |
| 1949 | Glen Oaks Village #2, Inc. | 350,000 |
| | Glen Oaks Village #3, Inc. | 240,000 |
| | Glen Oaks Village #4, Inc. | 250,000 |
| | Glen Oaks Village #6, Inc. | 600,000 |
| | Glen Oaks Village #7, Inc. | 650,000 |
| | Glen Oaks Village #9, Inc. | 605,000 |
| | Glen Oaks Village #11, Inc. | 375,000 |
| | Glen Oaks Village #12, Inc. | 155,000 |
| | Glen Oaks Village #13, Inc. | 270,000 |
| | Glen Oaks Village #15, Inc. | 305,000 |
| | Third Mars Homes, Inc. | 20,000 |
| | Fourth Mars Homes, Inc. | 40,000 |
| | Glen Oaks Shopping Center, Inc. | 10,000 |
| | Seton Realty Corporation | 28,000 |

On the dates of the distributions, the accumulated earnings or profits, or deficit, as of the beginning of the fiscal year and the earnings or profits, or loss, of the current fiscal year were as follows:

| | At beginning of fiscal year | | Current year | | Distribution charged to earned surplus |
|---|---|---|---|---|---|
| | Accumulated earnings or profits | Deficit | Earnings or profits | Loss | |
| G. O. Vill | | $76,173.48 | | $90,246.02 | |
| 1st Mars | | 26,970.70 | | 5,856.66 | |
| 2d Mars | | 29,581.67 | | 6,112.16 | |
| G. O. V. #2 | | 33,644.27 | $13,235.26 | | $13,235.26 |
| G. O. V. #3 | | 15,207.70 | 8,944.53 | | 8,944.53 |
| G. O. V. #4 | | 29,312.51 | 8,627.02 | | 8,627.02 |
| G. O. V. #6 | | 80,650.47 | | 21,375.40 | |
| G. O. V. #7 | | 61,886.96 | | 2,943.07 | |
| G. O. V. #9 | | 29,195.77 | | 45,872.44 | |
| G. O. V. #11 | | 11,914.40 | | 39,640.23 | |
| G. O. V. #12 | | 2,853.38 | | 20,183.01 | |
| G. O. V. #13 | | 487.57 | | 28,475.26 | |
| G. O. V. #15 | | 609.17 | | 38,018.86 | |
| P. L. Corp | $20,930.78 | | 11,503.04 | | 32,433.82 |
| P. L. #2 | 3,235.32 | | 1,785.42 | | 5,020.74 |
| P. L. #3 | 2,922.90 | | 680.54 | | 3,603.44 |
| P. L. #4 | 2,886.59 | | 793.23 | | 3,679.82 |
| P. L. #6 | 6,718.44 | | 3,847.12 | | 10,565.56 |
| P. L. #7 | 5,288.53 | | 3,594.32 | | 8,882.85 |
| P. L. #9 | 1,967.10 | | 2,953.54 | | 4,920.64 |
| P. L. #11 | | 1,958.85 | 1,476.33 | | 1,476.33 |
| P. L. #12 | | 1,471.64 | 404.55 | | 404.55 |
| P. L. #13 | | 1,593.44 | 500.01 | | 500.01 |
| P. L. #15 | | 2,080.65 | 870.41 | | 870.41 |
| 3d Mars | | 39,513.80 | | 10,587.02 | |
| 4th Mars | | 61,756.03 | 1,942.18 | | 1,942.18 |
| G. O. Sh. C | | 2,349.53 | | 5,241.87 | |
| Seton 1948 | | 10.00 | 7,797.93 | | 7,797.93 |
| Seton 1949 | | 10.00 | 12,593.05 | | 12,593.05 |

The source of the distributions made by these corporations to their stockholders in the stockholders' taxable years 1948 and 1949 was the earnings or profits of the corporations for the current fiscal year and

accumulated earnings or profits as of the beginning of such year to the extent thereof, as shown above; and the distributions in excess of such earnings, or where there were no earnings available, were from the following sources:

In the case of the four Mars Homes corporations, from cash resulting from the build-up of depreciation reserves;

In the case of the 11 Permanent Land corporations, from moneys borrowed by the corporations and secured by mortgages on their lands;

In the cases of the Glen Oaks Village corporations and Seton Realty Corporation, from cash accumulated from a combination of three sources: (1) Current gross rentals from tenants, (2) premiums received on bonds issued by the corporations to Prudential Insurance Company and New York State Employees' Retirement System, and (3) the excess of moneys borrowed for construction purposes, secured by a mortgage, over the cost of construction.

The premiums received by the Glen Oaks Village operating companies were in the following amounts:

| | | |
|---|---|---|
| From Prudential | Glen Oaks Village Inc | $108,546.25 |
| | Glen Oaks Village #2, Inc | 58,739.13 |
| | Glen Oaks Village #3, Inc | 40,144.59 |
| | Glen Oaks Village #4, Inc | 38,123.04 |
| | Glen Oaks Village #6, Inc | 91,505.86 |
| | Glen Oaks Village #7, Inc | 97,845.19 |
| | Glen Oaks Village #9, Inc | None |
| | Glen Oaks Village #11, Inc | None |
| From New York State Retirement | Glen Oaks Village #12, Inc | 8,720.00 |
| | Glen Oaks Village #13, Inc | 14,700.00 |
| | Glen Oaks Village #15, Inc | 16,780.00 |

$475,104.06

Under date of October 27, 1949, Glen Oaks Village, Inc., wrote the Comptroller of the Federal Housing Administration as follows:

With reference to the distribution made on December 15, 1948, we wish to submit the following information.

Although the cash outlay made by the company is less than the estimate made by you of the normal current cost to reproduce the property, this difference is explained by the fact that no payment was made for some expenses usually incurred in a building operation. These expenses included, among other things, the following.

1. Builder's and architect's fees normally paid to a general contractor.
2. Sub-contractors' fees and retailers overhead and profit where materials were procured directly by us through large scale cash purchases.
3. Free use of heavy building equipment.
4. Transfer, at original cost, of inventories of material, top soil, etc., on hand.

If these items had been paid for in cash by the company at prevailing prices at the time of delivery, and if the amount so paid had been added to the cash outlay by the company, the total amount paid would probably have exceeded your estimate of replacement cost.

By following this procedure we left the excess funds in the company during construction and thereby remained in a far better financial position than if we had

withdrawn the funds. Maintaining this liquid position at all times during the operation, particularly when prices of material and labor were rising daily, was our best guarantee of successful completion of the project.

This procedure resulted in cash on hand in the corporation on completion of the project. We made capital distribution of the surplus.

The surplus of mortgage moneys received by each of the Glen Oaks Village operating companies over the costs of construction and development was made possible for the reasons stated in the foregoing letter.

The heavy building equipment referred to in item 3 of the foregoing letter was owned by corporations controlled by George M. Gross, Alfred Gross, and Lawrence Morton.

George M. Gross was president, Alfred Gross was secretary, and Lawrence Morton was treasurer of all the Glen Oaks Village and Permanent Land corporations and of Glen Oaks Shopping Cenfer, Inc., during the taxable years.

The corporations here involved distributed over $6,000,000 in cash to the stockholders in proportion to their stockholdings. We are not unaware that the propriety of this action has elsewhere been questioned. However, the question of the propriety or impropriety of the distributions is not raised in these proceedings and we do not pass upon it. Our consideration is limited solely to the interpretation of the tax statutes presently applicable to the stipulated facts.

No contention is made that the cash distributions received by the petitioners are tax free, and the issue is not whether the distributions are taxable or not taxable. Rather, the principal question is whether the distributions are taxable as ordinary income, as the respondent has determined, or as capital gains under the provisions of section 115 (d) of the Internal Revenue Code, as the petitioners contend. The stockholders, who are the petitioners, applied section 115 of the Internal Revenue Code of 1939 [1] in determining the taxability of the distributions they received. Where the distributing corporation had earnings or profits of the current year or prior years, the distribution

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *

* * * * * * *

(d) OTHER DISTRIBUTIONS FROM CAPITAL.—If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1) is not treated as a dividend, whether or not otherwise a dividend.

was treated as a dividend to the extent of such earnings or profits, pursuant to section 115 (a) and (b). The amounts of the distributions in excess thereof were, pursuant to section 115'(d), next applied against the adjusted basis of the stock and the amounts in excess of such basis were treated as taxable in the same manner as gain from the sale or exchange of property. Since the stock had been held in every case for more than 6 months the last part of each distribution, which was the greater part, was treated as long-term capital gain.

The respondent concedes that the earnings or profits of the corporations were not increased by means of the writing up on the books of the appreciation in value of the real estate, and that the borrowing of moneys did not give rise to the realization of income, taxable or nontaxable, by the corporations. It is also conceded that the stockholders were correct in treating the undivided interests in vacant land distributed by Glen Oaks Shopping Center, Inc., as taxable pursuant to section 115 (d).

The respondent determined that the full amounts of the cash distributions are taxable at ordinary income rates to the petitioners. The respondent's principal contention is that section 115 (d) is not applicable in determining the taxability of these distributions because it has not been shown that the distributions impaired the capital of the corporation, citing *Commissioner* v. *Hirshon Trust*, (C. A. 2, 1954) 213 F. 2d 523, certiorari denied 348 U. S. 861, reversing a Memorandum Opinion of this Court, and *Commissioner* v. *Godley's Estate*, (C. A. 3, 1954) 213 F. 2d 529, certiorari denied 348 U. S. 862, reversing 19 T. C. 1082, in support of this proposition.

These cases involved the taxability to stockholders of a distribution by Southern Natural Gas Company of stock in a subsidiary which had appreciated in value. The available earnings or profits of the gas company exceeded the cost basis, but not the fair market value, of the distributed stock. As we understand the decisions, the Courts of Appeals held first, that the distribution was a dividend within the meaning of section 115 (a) and (b), since the earnings or profits of the distributing corporations exceeded the cost of the property, and second, that under section 115 (j)[2] the stockholders were taxable on the fair market value of the stock distributed to them. In the *Hirshon* case the Court of Appeals stated:

The appreciated value of the Southern Production stock was not, nor was it required to be, a distribution "out of" Southern's earnings or profits—it was simply a distribution *of* that appreciation which was not a part of Southern's earnings or profits or of its capital.

---

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(J) VALUATION OF DIVIDEND.—If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder.

The respondent stresses the statement in the *Hirshon* opinion that:

The taxpayer also argues that § 115 (d) prescribing capital gains treatment for any distribution which "is not out of increase in value of property accrued before March 1, 1913, *and is not a dividend*," embraces in that treatment the unrealized appreciation of a distribution in kind which exceeds the earnings or profits of the corporation before such distribution. However, we think that § 115 (d), as its caption "Other Distributions from Capital" indicates, is rather designed to subject to capital gains taxation those distributions which have left the capital of the corporation impaired. And concededly these distributions did not have that result.

The respondent argues that the petitioners have failed to show that the distributions here impaired the capital of the corporations and that, in accordance with the foregoing statements of the Court of Appeals for the Second Circuit, these distributions of cash may not be treated as payments *out of* capital taxable pursuant to section 115 (d), but must be held taxable as ordinary income.

We do not agree that this contention of the respondent is determinative of this case. Section 22 (e) of the Internal Revenue Code provides that "distributions by corporations shall be taxable to the shareholders as provided in section 115." We have pointed out that section 115 is concerned with the effect taxwise upon the stockholder, rather than upon the corporation, of corporate distributions. *August Horrmann*, 34 B. T. A. 1178 (1936). The term "distribution" includes all that a corporation can pay out to its stockholders as distributees. The applicable regulation, Regulations 111, section 29.115-4, captioned "DISTRIBUTIONS OTHER THAN A DIVIDEND" provides that section 115 (d) applies in the case of "*any* distribution" (emphasis supplied) other than a dividend, with certain other exceptions not here involved. There is no qualification in the regulation to the effect that it is limited to distributions which impair capital.

The legislative history of section 115 (d) is illuminating as to its intended scope. The predecessor of this section appeared as section 201 (d) of the Revenue Act of 1924. It provided:

If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not out of earnings or profits, then the amount of such distribution shall be applied against and reduce the basis of the stock provided in section 204, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property.

The House committee report concerning this provision (H. Rept. No. 179, 68th Cong., 1st Sess., p. 12, 1939-1 (part 2) C. B. 241, 250) states:

This subdivision provides that amounts distributed by a corporation which do not constitute distributions of earnings or profits or increase in value of property accrued prior to March 1, 1913 (such as distributions out of unrealized appreciation in value of property or out of depreciation or depletion reserves),

constitute a return of capital to the stockholder and are taxable to him only if, and to the extent that, they exceed the basis of his stock.

In 1936 the phrase "out of earnings or profits" was eliminated and "a dividend" was substituted. The provision evidently was intended to prescribe the treatment of all distributions which were not in partial or complete liquidation nor out of pre-1913 increase in value, and were not out of earnings or profits.

Such has been the interpretation in decisions of this and other courts. For example, in *Commissioner* v. *Timken,* (C. A. 6, 1944) 141 F. 2d 625, affirming 47 B. T. A. 494, a corporation distributed to its stockholders cash in an amount exceeding its earnings or profits for the taxable year and prior years, and on the following day distributed 12,000 shares of stock in another company. The Court of Appeals said:

It was clearly not the intention of the Investment Company to distribute the 12,000 shares of stock of the Coach Company as income or dividends to its stockholders in the sense defined by Sec. 115 (a) of the Act of 1936 [similar to section 115 (a) of the Code] * * * because it had already, on the day before, distributed to its stockholders $200,000 which represented dividends or income in excess of its earnings for that year. This distribution of its shares *was a distribution of its capital because it at that time had nothing else out of which it could make distribution* and we think the case must be ruled by Sec. 115 (d) headed "Other distributions from capital" * * * [Emphasis supplied.]

In *R. D. Merrill Co.,* 4 T. C. 955, 963, we said:

A corporation can make no distribution of dividends without something to distribute, and any distribution of more than the residue left in earnings and profits must, necessarily and mathematically, be from either capital or paid-in surplus * * *

In *W. G. Maguire & Co.,* 20 T. C. 20, we considered distributions to stockholders of Missouri-Kansas Pipe Line Company, referred to as Mokan. There were two cash distributions and one of rights to purchase stock of a subsidiary. The distributions were not made in liquidation or partial liquidation. We there stated (p. 34):

The principal issue here arises out of respondent's determination that Mokan's distributions during 1944 were taxable as "dividends" to its stockholders, taxable that is to the extent of 24.14 per cent of the amount received by the stockholders. The taxability of the distributions was so limited by respondent because according to his computations, only $856,880.94 in earnings or profits was available to Mokan for distribution as dividends. *The balance of Mokan's distributions during 1944 would necessarily be from its capital.* [Emphasis supplied.]

In *Shield Co.,* 2 T. C. 763 (1943), the taxpayer's subsidiary corporation declared a dividend and borrowed money from the taxpayer with which to pay the dividend. The taxpayer reported the receipt of a dividend as income and claimed a dividends received credit. The amount of the subsidiary's earnings or profits was less than the amount of the dividend declared. The respondent determined that the distri-

bution in excess of the earnings or profits was not a dividend but was taxable pursuant to section 115 (d) of the applicable revenue acts. We sustained the respondent. In that case, as in some of the cases here, the distribution was out of borrowed funds. In that case we stated (p. 767):

> With respect to section 115 (d) * * *, the language is clear and unambiguous. It requires, under circumstances therein set forth, that corporate distributions to shareholders be treated in the same manner as a gain from the sale or exchange of property. Such treatment must be accorded the distributions in the hands of the shareholder only if, as pertains to the distributing corporation, they were (1) not made in partial or complete liquidation; (2) not made out of increase in value of property accrued before March 1, 1913; and (3) not made out of earnings and profits; and, as pertains to the shareholder, if they exceeded the adjusted basis of his stock.

It is evident from the foregoing that section 115 (d) is intended to be applicable to distributions by corporations from all sources other than earnings or profits, except for liquidating distributions to which section 115 (c) applies or stock dividends within the scope of section 115 (f). It is stipulated that these distributions were not in partial or complete liquidation of the corporations. As in the above cases, the cash distributions here must be one or the other, (1) out of earnings or profits and hence "dividends" pursuant to section 115 (a) and (b), or (2) distributions within the scope of section 115 (d). These distributions, to the extent they exceeded the earnings or profits, must be controlled by section 115 (d).

The decisions of the Courts of Appeals in the *Hirshon* and *Godley* cases, *supra*, do not require a different result. In those cases the appellate courts concluded that the property distributed was a dividend in its entirety because the amount of earnings or profits available was sufficient to cover the cost of the property and having so concluded they held that in the hands of the stockholders this dividend was to be valued at fair market value as required by section 115 (j). It appears that in the view of the Courts of Appeals section 115 (d) never became applicable because the entire distribution was classed as a dividend. In the present cases the distributions exceeded the amounts of earnings or profits available for dividend purposes, so that the excess could not be a dividend and necessarily section 115 (d) became applicable. Also no valuation problem was involved as all the distributions in controversy were in cash.

The remark of the Court of Appeals for the Second Circuit in the *Hirshon* case to the effect that section 115 (d) is designed to subject to capital gains treatment only those distributions which have left capital impaired would not be inconsistent with application of that section here. That court did not define "capital" or describe what sources of distribution should be regarded as impairing capital, stat-

ing that concededly the distribution there did not have that result. In the present cases it seems obvious that these distributions of cash which are conceded to have been in excess of the available earnings or profits were out of "capital" in the sense that this term was used in the *Timken* and *Maguire & Co.* cases, *supra*, and that they reduced and therefore impaired such capital of the distributing corporations. We consider unnecessary any further proof of such impairment.

We do not think the *Hirshon* and *Godley* cases, which are reversals of decisions of this Court, are applicable to the cases before us. Hence, it is unnecessary to decide here whether or not we will follow the reversals.

The distributions by the four Mars Homes corporations were, it is stipulated, out of depreciation reserves. Depreciation reserves are generally regarded as of the nature of capital, representing a part of the cost of the assets used in the business, and distributions from such reserves have been held to constitute distributions of capital rather than income. *Douglas Hotel Co.*, 14 T. C. 1136 (1950), affd. (C. A. 8, 1951) 190 F. 2d 766; *John K. Beretta*, 1 T. C. 86 (1942), affd. (C. A. 5, 1944) 141 F. 2d 462, certiorari denied 323 U. S. 720. Regulations 111, section 29.115-6, states that:

A reserve set up out of gross income by a corporation and maintained for the purpose of making good any loss of capital assets on account of depletion or depreciation is not a part of surplus out of which ordinary dividends may be paid. A distribution made from a depletion or a depreciation reserve based upon the cost or other basis of the property will not be considered as having been paid out of earnings or profits, * * *

The respondent contends, for the first time on brief, that this provision of the regulations is not applicable here because there is no showing of cost or other basis of the depreciable property. These corporations owned and operated sections of a housing project. The balance sheets of these corporations for the ends of the fiscal years within which their distributions were made are in evidence. They list as assets, cash, accounts receivable, land, depreciable assets, deferred and prepaid expenses and deposits, and appreciation of realty. They list as liabilities, accounts payable, mortgage payable, and reserve for depreciation. As capital accounts they list capital stock, surplus from realty appreciation, and earned surplus or deficit. The last item showed as a deficit in the case of each corporation. It is evident that these corporations had no assets of a nature that would be subject to depreciation on any other basis than cost. There is nothing in the record to indicate that the respondent has ever questioned the amount of depreciation claimed or allowable. The distributions by these corporations were properly treated under section 115 (d) by the petitioners.

The respondent contends, in the alternative, that the distributions to George M. Gross, Alfred Gross, and Lawrence Morton by the Glen Oaks Village companies represented salaries to them for their services as officers and therefore are taxable to them as ordinary income. The respondent also points out that the Glen Oaks Village companies did not pay for the use of certain heavy building equipment which belonged to other corporations owned by these men and received various materials at cost from such sources, as described in the letter from Glen Oaks Village, Inc., to the Comptroller of the Federal Housing Administration, quoted in our Findings of Fact. Hence these distributions, the respondent argues, represent executives' salaries and fees for builder, architect, and subcontractors.

Admittedly, these men were builders of considerable experience. They directed and supervised the Glen Oaks Village project, including its planning, financing, and construction. Undoubtedly they performed valuable services for the Glen Oaks Village companies. They controlled these companies and the Permanent Land corporations as well. They could have arranged to have the corporations pay them substantial salaries and pay higher prices for materials and pay rent for the use of building equipment which was furnished through other corporations owned by these officers. The answer to the respondent's argument, however, is that there was no existing obligation of law or contract that any such payments be made, nor is there anything in the record, aside from the respondent's contention, which might cause us to characterize these corporate distributions as "compensation." It has been stipulated that all the distributions were in proportion to the stockholdings. Most of the stockholders performed no services whatsoever, yet they received their proportionate shares of the cash distributed. We find no factual basis for concluding that the distributions were in fact compensation or even in lieu of compensation. If the directors who were also officers chose to charge nothing for their services and the corporations paid nothing for their services the respondent is without authority to treat capital distributions to them as remuneration. Taxpayers have the right so to arrange their affairs that their taxes shall be as low as possible and the tax consequences flow from what they did rather than from what they might have done. *United States* v. *Isham,* 17 Wall. 496, 506 (1873) ; *Seminole Flavor Co.,* 4 T. C. 1215, 1230, and 1235. *Koppers Co.,* 2 T. C. 152, 158. The petitioners correctly treated the distributions in their returns.

These cases involve uncontested adjustments which will require computations under Rule 50.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

TURNER, *J.*, concurring: I concur in the result on the dividend issue, because as I read it and as the majority Opinion seems to me to demonstrate, the applicable statute precludes the contrary result. It may serve some helpful purpose, however, to point out that, prospectively at least, Congress has now legislated to eliminate the avenue by which the controlling stockholders of corporations in situations such as those herein have managed to steer corporate distributions through section 115 (d) of the Internal Revenue Code of 1939 rather than section 115 (a).

Under the applicable statute, a corporation, by distributing money borrowed against unrealized appreciation or anticipated earnings or profits, could effect a distribution, which, under section 115 (d), would to its shareholders be a capital distribution taxable as capital gain, even though through application of subsequent earnings or profits in repayment of the loan the prior distribution in the end becomes an effective distribution of earnings or profits so applied, thus bypassing section 115 (a), under which the distribution of such earnings or profits would have been a dividend taxable to the shareholders as ordinary income. The controlling effect of section 115 (a) in limiting dividend treatment to distributions by a corporation "out of its" accumulated earnings or profits is, it seems to me, all the more pointed in cases such as we have here, since in the absence of a provision to the contrary the corporation laws of the various States, as I understand them, not only permit distributions out of or against unrealized appreciation but, for the purposes of the distributions, such appreciation is treated as surplus and the distributions as dividends which do not impair capital.

By section 312 (j) of the Internal Revenue Code of 1954, it is now provided that in cases where, through the guaranteeing of loans by the United States, a corporation has been able to borrow money against its assets so as to make possible distributions of the character herein involved, then, for the purpose of determining the amount of earnings or profits available to the corporation for the payment of dividends, the earnings or profits are to be increased to the extent that the amount of the loan exceeds the adjusted basis of the property to the corporation. For reasons of its own, however, Congress has fixed the effective date of section 312 (j) at June 22, 1954, and it does not apply to distributions made prior to that date, as were the distributions herein. The Committee on Finance did indicate in its report to the Senate that in proposing enactment of the said section no implication was intended to be drawn with respect to any decision made or litigation pending "under present law with respect to this subject matter, whether or not such loans are made, guaranteed, or insured by the United States." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 251.