Estate of Carl C. Myers, Deceased, Jeanette Myers, Executrix, and Jeanette Myers, Surviving Wife v. Commissioner. Estate of Louis Alper, Deceased, Henry Alper and Sam Alper, Co-Executors, and Reva Alper, Surviving Wife v. Commissioner.
Estate of Myers v. Commissioner
Docket Nos. 51797, 51798.
United States Tax Court
T.C. Memo 1956-151; 1956 Tax Ct. Memo LEXIS 133; 15 T.C.M. (CCH) 750; T.C.M. (RIA) 56151; June 29, 1956
Phillip Nusholtz, Esq., National Bank Building, Detroit, Mich., for the petitioners. Robert J. Fetterman, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of petitioners as follows: Docket
Petitioner
No.
Year
Deficiency
Estate of Carl C. Myers
51797
1949
$2,332.14
1950
2,229.22
Estate of Louis Alper
51798
1949
3,759.06
The issue presented for our decision is the correctness of the respondent's action in determining that gains resulting from certain corporate distributions received by petitioners are taxable to them as ordinary income. All other issues presented by the pleadings were abandoned by petitioners at the hearing. Findings of Fact A portion *134 of the facts are stipulated and are found accordingly. Louis Alper and Reva Alper, his wife, filed their joint Federal income tax return for 1949 with the collector of internal revenue for the district of Michigan at Detroit, Michigan. Louis Alper is deceased and Henry Alper and Sam Alper are co-executors of his estate. Carl C. Myers and Jeanette Myers, his wife, filed their joint Federal income tax returns for 1949 and 1950 with the collector of internal revenue for the district of Michigan at Detroit, Michigan. Carl C. Myers is deceased and Jeanette Myers is executrix of his estate. Myers and Alper were builders and were engaged in the real estate and construction business during the years in issue. They were partners in a construction firm, Acme Home Builders Project A, and engaged in the business of selling land. In 1948, Myers and Alper acquired some land in the city of Detroit for the purpose of building 96 dwelling units thereon. The price paid for the foregoing land was $49,600. Alper and Myers, by agreement, had 60 per cent and 40 per cent interests, respectively, in the land. Late in 1948, Alper and Myers and their wives formed three corporations known as Greenfield *135 Manor No. 1, Inc., Greenfield Manor No. 2, Inc., and Greenfield Manor No. 3, Inc., hereinafter referred to as Manor 1, Manor 2, and Manor 3. The articles of incorporation for Manor 1, Manor 2, and Manor 3 were filed on April 7, 1949, with the Michigan Corporation and Securities Commission by Mrs. Alper and Mrs. Myers. The articles of each of the corporations are identical in form and content except for the names of the corporations. The general purpose of the corporations was stated to be the provision of houses for rent or sale and the acquisition of real estate and personal property in connection therewith. The total authorized capital stock of each corporation was listed in the articles as follows: Preferred
100 shares
par value $1 per share
Common A
3,000 shares
par value $1 per share
Common B
1,200 shares
price fixed for sale $1
per share - (no par)
book value $1.
The foregoing articles contained a detailed provision for the retirement of Class A common stock, the pertinent portion of which reads as follows: "The corporation, through its Board of Directors, and conformable with the applicable laws of the State of Michigan, may from time *136 to time retire the whole or any part of the Class-A Common Stock at the end of any quarter-annual fiscal period at not more than one hundred dollars for each share plus dividends declared thereon, but unpaid to date of such retirement, and without notice to the holders of any other classes of stock of this corporation, out of the funds representing earned or donated surplus remaining at the end of such quarter-annual fiscal period, after payment of, or segregation of funds for the payment of all operating expenses, taxes, assessments, and fixed charges, whether due or accrued, and after payment of all interest and principal payments and deposit for taxes, assessments, water rates, mortgage insurance premiums, and hazard insurance premiums, all as required by the terms of the (mortgages) insured by the Commissioner, and after the establishment and maintenance of the reserve (funds) for replacements called for in Section (d) of this Article IV of the Articles of Incorporation. No such stock shall be retired until after the completion of the construction of the improvements on the property of the corporation in accordance with the terms of the building loan (agreements) between the corporation *137 and the (lenders) named in said building loan (agreements) nor before final endorsement for mortgage insurance by the Federal Housing Commissioner of the credit (instruments) given to the (lenders). * * *" Louis Alper was president and treasurer of each corporation, Reva Alper was vice president and Carl C. Myers was secretary during the years here in issue. The share journal of each corporation shows that Alper and Myers were issued a total of 1,800 and 1,200 shares, respectively, of the Class A common stock of each corporation on May 31, 1949, and that Mrs. Alper and Mrs. Myers were issued a total of 600 and 400 shares, respectively, of Class B common stock of each corporation on March 21, 1949. Additional shares subsequently were issued to Alper and Myers by each of the three corporations. Shortly before the formation of the three aforementioned corporations, Alper, on behalf of each corporation, submitted three applications for mortgage insurance under section 608 of the National Housing Act, with respect to the proposed construction of housing projects by each of the three corporations, and requesting a commitment for insurance by the Federal Housing Administration for advances *138 of mortgage proceeds to each corporation during the course of construction in the total amount of $259,200. Each of the foregoing applications contained an item denominated "builder's fee" estimated at $16,205. The project analysis, dated March 1, 1949, prepared by the Federal Housing Administration for the construction projects included $17,393, $17,388 and $17,357 as builder's fees in its estimate of the cost of the construction of the projects proposed by Manor 1, Manor 2, and Manor 3, respectively. A commitment for insurance was issued by the Federal Housing Administration for each of the proposed projects on March 8, 1949, pursuant to which the FHA agreed to insure a first mortgage on each of the projects in an amount not to exceed $259,200. On May 13, 1949, building loan agreements for loans of $259,200 and mortgages to secure such loans were executed between Manor 1, Manor 2, and Manor 3, as mortgagors, and the New York Life Insurance Company, as mortgagee, for the financing of the construction of the respective projects. The land acquired by Myers and Alper in the Detroit area in 1948 with the intention of erecting 96 dwelling units thereon was divided and conveyed by *139 them as a contribution to each of the corporations in the form of donated surplus. Subsequent to the conveyance of the land to the corporations, the following entries, dated May 31, 1949, appear in the journals of each of the corporations: "Manor 1: Land 57,502.90 Donated Surplus 57,502.90 "To record the contribution by the shareholders of the Class A Common Stock of lots 52 through 67 inclusive and South 2.58 ft. front and South 2.13 feet rear of lot 68, Frischkorn's Joy Road Sub at appraised value of 821.47 feet at $70.00 a foot. "Manor 2: Land 58,067.10 Donated Surplus 58,067.10 "To record the contribution by the shareholders of Class A Common Stock of Lots as follows: No. 48.67 ft. in rear of Lot 68 and all of Lots 69 through 84 both inclusive of Frischkorn's Joy Road Subdivision at the appraisal value of 829.53 feet at $70 a foot. "Manor 3: Land 57,890.00 Donated Surplus 57,890.00 "To record the contribution by the shareholders of their Class A Common Stock of Lots 85 through 92 both inclusive and Lots 111 through 118 both inclusive of Frischkorn's Joy Road Subdivision at the appraised value of 827 feet at $70.00 a foot." Entries were made in the journals *140 of each of the three corporations crediting the donated surplus account in the amount of $1,352.64, representing architect's fees and corporation costs paid by Alper and Myers and donated to each corporation. On May 2, 1949, Alper and Myers formed a partnership, The M & A Building and Contracting Company, hereinafter referred to as M & A, in which they had 60 per cent and 40 per cent interests, respectively. The capital contributions of Alper and Myers to M & A were cash in the respective amounts of $3,000 and $2,000. On May 13, 1949, separate construction contracts were entered into between M & A and Manor 1, Manor 2, and Manor 3. Myers signed the contracts for the partnership as partner, and Alper signed on behalf of each corporation as president. Each contract provided for the construction of the projects by the partnership as contractor. The following provision, identical in each of the contracts, except for minor differences in the amount, appears in the contract for the construction of the project for Manor 1: "The owner shall pay the contractor for the performance of the contract, the contractor's actual cost of labor and materials used in the performance of this contract, *141 plus contractor's overhead and supervision costs and expenses but in no event shall the contractor receive more than the total sum of $248,473.00." The ceiling figures stated in the contracts for the construction of Manor 2 and Manor 3 were $248,401 and $247,964, respectively. The FHA approved the foregoing construction contracts. The total estimated cost of on-site construction was exclusive of fees, and the contractor's cash fee was specifically eliminated in the trade payment breakdown incorporated as a part of each construction contract. As the construction of the projects progressed, Alper, as president of the three corporations, submitted periodically on behalf of each corporation standard FHA forms entitled "Contractor's Requisition" requesting payment for the percentage of work performed on each project based upon the provisions and the terms contained in the construction contracts. Each requisition was reviewed and approved by the New York Life Insurance Company and the FHA. Upon approval by the FHA, the percentage of the construction loan money requested was paid to the corporation. The following schedule shows the total advances on the construction loan received *142 by Manor 1 from the lender, New York Life Insurance Company, and the payments by Manor 1 to M & A: Received by Manor 1
Date
Amount
June 29, 1949
$ 6,289
July 12, 1949
57,178
August 5, 1949
48,630
September 8, 1949
57,221
October 5, 1949
45,223
November 3, 1949
10,661
December 30, 1949
33,998
$259,200
Paid by Manor 1 to M & A
July 1, 1949
$ 4,000
July 13, 1949
50,000
July 29, 1949
5,000
August 4, 1949
48,000
September 1, 1949
5,000
September 8, 1949
55,000
October 6, 1949
39,000
November 3, 1949
10,500
$216,500
On December 30, 1949, M & A repaid $13,937.32 to Manor 1. An entry, dated December 31, 1949, appears in the general journal of Manor 1 setting up the cost of the building and equipment at $202,562.68 and crediting M & A building and construction advances account for such amount. The following schedule shows the total advances on the construction loan received by Manor 2 from the lender, New York Life Insurance Company, and the payments by Manor 2 to M & A: Received by Manor 2
Date
Amount
June 30, 1949
$ 6,361
July 11, 1949
4,437
August 5, 1949
37,106
September 8, 1949
46,549
October 5, 1949
50,329
November 1, 1949
51,653
December 6, 1949
23,423
January 6, 1950
10,064
February 2, 1950
29,278
$259,200
Paid by Manor 2 to M & A
July 1, 1949
$ 4,000
August 4, 1949
4,000
August 5, 1949
37,000
September 8, 1949
45,000
October 6, 1949
44,000
November 3, 1949
51,500
December 7, 1949
25,000
$210,500
*143 On February 28, 1950, M & A paid $3,639.22 to Manor 2. An entry, dated February 28, 1950, appears in the general journal of Manor 2 setting up the cost of the building and equipment at $206,997.91 and crediting M & A building and construction advances account for such amount. The following schedule shows the total advances on the construction loan received by Manor 3 from the lender, New York Life Insurance Company, and the payments by Manor 3 to M & A: Received by Manor 3
Date
Amount
June 30, 1949
$ 6,752
July 12, 1949
1,374
August 5, 1949
14,195
September 8, 1949
70,464
October 5, 1949
36,052
November 2, 1949
33,362
December 6, 1949
43,607
January 6, 1950
15,769
February 28, 1950
37,625
$259,200
Paid by Manor 3 to M & A
July 1, 1949
$ 4,000
August 5, 1949
14,000
September 1, 1949
1,000
September 8, 1949
68,000
October 6, 1949
29,000
November 3, 1949
33,300
December 7, 1949
44,000
January 6, 1950
9,000
January 6, 1950
8,000
$210,300
M & A paid $3,000 on December 31, 1949, and $8,500 on February 28, 1950, to Manor 3. An entry, dated February 28, 1950, appears in the general journal of Manor 3, setting up the cost *144 of the building and equipment at $200,573.02 and crediting M & A building and construction advances account for such amount. No contractor's fee or other compensation was included in the above-described advances to the three corporations. Each corporation paid Alper a $6,000 salary as president during 1950. In December 1949, the board of directors of each corporation voted to retire a portion of the Class A common stock of Alper and Myers. During 1950, the board of directors of each corporation voted to retire additional shares of the Class A common stock held by the aforementioned stockholders. Accordingly, a portion of the Class A common stock was retired and payments made in cash therefor as follows: Alper
Shares of stock retired
Date of payment
Manor 1
Manor 2
Manor 3
Amount received
December 30, 1949
1,680
$27,720
February 13, 1950
1,560
25,740
February 28, 1950
1,200
20,400
April 25, 1950
360
6,120
September 8, 1950
39
18
24
8,100
Total
1,719
1,578
1,584
$88,080
Myers
Shares of stock retired
Date of payment
Manor 1
Manor 2
Manor 3
Amount received
December 30, 1949
1,120
$18,480
February 13, 1950
1,040
17,160
February 28, 1950
800
13,600
April 25, 1950
240
4,080
September 8, 1950
26
12
16
5,400
Total
1,146
1,052
1,056
$58,720
*145 The foregoing distributions to Alper and Myers were made in direct proportion to their stockholdings. All of the stock surrendered by Alper and Myers had been held by them for more than 6 months. The following is a summary of the donated surplus account appearing on the ledgers of Manor 1, Manor 2 and Manor 3: Credit entries
Manor 1
Manor 2
Manor 3
1. Representing contribution of land by
$57,502.90
$58,067.10
$57,890.00
Alper and Myers
2. Representing contribution of
1,352.64
1,352.64
1,352.64
architect's fees and incorporation costs
by Alper and Myers
Total
$58,855.54
$59,419.74
$59,242.64
Debit entries
Representing payments to Alper and Myers
49,835.00
43,270.00
45,560.00
for redemption of stock
Balance (9/30/50)
$ 9,020.54
$16,149.74
$13,682.64
The net operating loss and deficit in the surplus of each of the three corporations at the close of 1949 and 1950 were as follows: 1949 Net
1949 Surplus
1950 Net
1950 Surplus
operating loss
deficit
operating loss
deficit
Manor 1
$1,169.61
$1,382.26
$6,066.93
$ 7,449.19
Manor 2
7,825.27
8,037.92
5,693.76
13,731.68
Manor 3
9,602.06
9,814.71
5,438.19
15,252.90
*146 In the joint return filed by Carl C. Myers and Jeanette Myers for 1950, the cost of the Class A common stock of each corporation was stated to be: Manor 1
$6.93 per share
Manor 2
6.98 per share
Manor 3
6.97 per share
In the joint return filed by Louis Alper and Reva Alper for 1949, the cost of 1,680 shares of Class A common stock of Manor 1 was stated to be $11,637.95, or a fraction of a cent less than $6.93 per share. The difference between the cost of the stock and the amount received as a distribution from Manor 1 during 1949, in the amount of $16,082.05, was reported as long-term capital gain. The partnership return of M & A for the taxable year May 2, 1949, through March 31, 1950, discloses no compensation or profit resulting from the construction of the housing projects for Manor 1, Manor 2 and Manor 3. All of the distributions made by Manor 1 in 1949 and 1950 and by Manor 2 and Manor 3 in 1950 were made out of the capital of those corporations and, consequently, resulted in the impairment of the capital of each corporation. The foregoing distributions were charged against the capital stock and donated surplus accounts on the ledger of each corporation. *147 The sources of the distributions made to Alper and Myers during those years were the excess funds withdrawn by the three corporations under the loans from New York Life Insurance Company insured by the FHA. Opinion The corporations here involved distributed approximately $147,000 during 1949 and 1950 to its Class A common stockholders in direct proportion to their stockholdings. Respondent has taken the position that the foregoing distributions are taxable to petitioners at ordinary income rates. In support of his position, respondent contends, first, that the amounts received by Alper and Myers from the three corporations during those years represent compensation for services rendered by them to the corporations or, in the alternative, that the foregoing amounts represent corporate distributions which were neither made out of capital nor in partial or complete liquidation. Petitioners maintain that the aforementioned distributions were not in the nature of compensation but represent distributions made out of capital and are therefore taxable to them as long-term capital gain under section 115(d) of the Internal Revenue Code of 1939. [1]
*148 The respondent points out that the applications for mortgage insurance filed with the FHA on behalf of Manor 1, Manor 2 and Manor 3 contained, among other estimated cost items, a request for a builder's fee to be paid the contractor, M & A. Further, the FHA project analysis, subsequently prepared and filed by each of the foregoing corporations, lists "builder's fees" as a part of the estimated replacement cost of the property. However, each of the construction contracts executed by Manor 1, Manor 2 and Manor 3, respectively, and M & A contained the following clause under Article 3: "The owner shall pay the contractor for the performance of the contract, the contractor's actual cost of labor and materials used in the performance of this contract, plus contractor's overhead and supervision costs and expenses but in no event shall the contractor receive more than the total sum of * * *." [Italics added.] Thus the terms of the contract refer only to the actual cost of construction. The contract contains no reference to "fees," "profits," "compensation," or any similar expression. In addition, the trade payment breakdown, which was attached to and made a part of each construction *149 contract, shows that the parties did not intend to provide for the payment of compensation to the contractor since no amount was assigned to the item entitled "contractor's fee." In effect, therefore, M & A agreed with each of the three corporations to construct the housing units at cost. Moreover, none of the payments made to M & A by the three construction corporations pursuant to the periodic withdrawals under the FHA insured loans were characterized as builder's fees or appear to have been intended as such. Therefore, in the absence of a contractual or other legal obligation to pay builder's fees to Alper and Myers as compensation for services rendered by them to each of the corporations and in the absence of evidence tending to show that any of the payments made to M & A were so intended, we are unable to hold that the distributions here in question represent compensation. George M. Gross, 23 T.C. 756 (on appeal C.A. 2). In the alternative, respondent contends that the amounts received by Alper and Myers in 1949 and 1950 are taxable at ordinary income rates as corporate distributions made neither out of the distributing corporation's capital nor in partial or *150 complete liquidation, in accordance with the principles enunciated in Commissioner v. Hirshon Trust, 213 Fed. (2d) 523, and Commissioner v. Godley's Estate, 213 Fed. (2d) 529. The three corporations here involved sustained net operating losses resulting in surplus deficits during the years in issue. At the time the directors retired a portion of the Class A common stock and made cash distributions to the holders thereof, none of the corporations had either current or accumulated earnings or profits. The sources of the distributions were the funds borrowed by the three corporations in excess of the cost of the respective projects. The distributions were charged against the capital stock and donated surplus accounts on the books of each corporation. The proper tax treatment to be accorded corporate distributions made under circumstances similar to those here presented was decided by this Court in George M. Gross, supra. The taxpayers there formed several corporations for the purpose of erecting two-story apartment houses containing a total of 2,900 apartments. The cost of construction was financed by mortgage loans made by a bank which were *151 insured by the FHA under section 608 of the National Housing Act, as amended. The taxpayers (stockholders) owned the land upon which the buildings were erected. After incorporation, the land was conveyed to the various corporations and was entered on the corporate books at an appreciated valuation figure. After the buildings had been completed and the full face amount of the mortgage loan received, it was found that the proceeds of the loan received by the corporations exceeded the cost of constructing the projects. Consequently, cash distributions in excess of the earnings or profits of the distributing corporations were made to the stockholders and reported by them as capital gains on their income tax returns. After setting forth in detail our reasons for concluding that the distributions in issue were not controlled by the Hirshon and Godley decisions, supra, we there held that the taxpayers correctly reported the amounts received as corporate distributions, stating as follows at page 771: "It is evident from the foregoing that section 115(d) is intended to be applicable to distributions by corporations from all sources other than earnings or profits, except for liquidating distributions *152 to which section 115(c) applies or stock dividends within the scope of section 115(f). It is stipulated that these distributions were not in partial or complete liquidation of the corporations. As in the above cases, the cash distributions here must be one or the other, (1) out of earnings or profits and hence "dividends" pursuant to section 115(a) and (b), or (2) distributions within the scope of section 115(d). These distributions, to the extent they exceeded the earnings or profits, must be controlled by section 115(d). In the present cases the distributions exceeded the amounts of earnings or profits available for dividend purposes, so that the excess could not be a dividend and necessarily section 115(d) became applicable. * * *" We have subsequently reaffirmed our decision in George M. Gross, supra, in Harry Handley Cloutier, 24 T.C. 1006 (on appeal C.A. 9); Thomas Wilson, 25 T.C. - (Feb. 21, 1956); and W. H. Weaver, 25 T.C. - (Feb. 21, 1956). Applying the principles enunciated in the foregoing decisions to the situations here in question, we hold that the distributions involved are taxable to petitioners pursuant to the provisions of section 115(d) *153 of the 1939 Code and, in accordance therewith, since the stock had been held for more than 6 months, the distributions in issue should first be applied in reduction of the adjusted basis of the stock, and any amounts distributed in excess of such basis are taxable as long-term capital gain. Decisions will be entered under Rule 50. Footnotes
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(d) Other Distributions From Capital. - If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distributions shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f)(1), is not treated as a dividend, whether or not otherwise a dividend.↩